**ELLIOTT ASSOCIATES, L.P. and Westgate International, L.P., Plaintiffs,**

v.

**Dennis C. HAYES, Ronald Howard, S.P. Quek, M.C. Tam, Chiang Lam, P.K. Chan and Barbara Perrier Dreyer, Defendants.**

No. 00 CIV. 4483(SAS).

United States District Court, S.D. New York.

Dec. 28, 2000.

David Parker, Edward P. Grosz, Kleinberg, Kaplan, Wolff & Cohen, P.C., New York City, for Plaintiffs.

Joseph G. Finnerty, III, Marilla Ochis, Joshua S. Sohn, Piper Marbury Rudnick &

Wolfe LLP, New York City, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

In this securities fraud case, plaintiffs Elliott Associates, L.P. ("Elliott") and Westgate International, L.P. ("Westgate") have sued defendants for the failure of Hayes Corporation ("Hayes") to fully honor plaintiffs' contractual right to convert certain preferred stock into Hayes common stock. Plaintiffs allege that defendants violated section 10(b) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). Plaintiffs also assert various state law claims including breach of fiduciary duty, tortious interference with contract, breach of contract, and common law fraud. Defendants now move to dismiss the Complaint pursuant to Rules 12(b)(1), 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. Because plaintiffs have failed to state a federal securities claim upon which relief can be granted, defendants' motion is granted and the Complaint is dismissed with prejudice.

## I. FACTS [1]

### A. The Convertible Preferred Stock

Elliott and Westgate are limited partnerships engaged in trading securities. ¶¶ 34, 35. Defendants are the former officers, directors and controlling persons of Hayes who owned 71.7% of Hayes Common Stock. ¶¶ 1, 6. In the fall of 1997, Hayes (then known as Access Beyond, Inc.) agreed to sell plaintiffs 15,000 shares of 6% Cumulative Convertible Preferred Stock for an aggregate purchase price of $15,000,000. ¶ 1. The Convertible Preferred Stock was issued in connection with the merger of Access Beyond, Inc. and Hayes Microcomputer Products, Inc. (the "Hayes Merger"). ¶ 26. The Hayes Merger and the sale of the Convertible Preferred Stock constituted a single, integrated transaction designed by the defendants to provide significant amounts of cash to the merged entity. ¶ 27.[2] On July 29, 1997, an Agreement and Plan of Reorganization was executed (the "Hayes Merger Agreement"), and on December 30, 1997, the Hayes Merger was consummated. ¶¶ 28, 29. Hayes Microcomputer Products, Inc. became a wholly-owned subsidiary of Access Beyond, Inc. which then changed its name to Hayes Corporation. ¶ 29.

On November 12, 1997, Hayes entered into an Investment Agreement with Elliott, Westgate and others for the issuance of 45,000 shares of Convertible Preferred Stock, at $1,000 per share, for an aggregate purchase price of $45,000,000. ¶ 25. Ten thousand Convertible Preferred Shares were issued on November 12, 1997 while the remaining thirty-five thousand shares were issued on December 30, 1997. Id. Collectively, plaintiffs purchased a to-

---

[1]. The facts, assumed true for purposes of this motion, are referenced with paragraph numbers taken from the Complaint, a copy of which is attached as Exhibit A to the 9/18/00 Affidavit of Joseph G. Finnerty III Submitted In Support of Defendants' Motion to Dismiss ("Finnerty Aff.").

[2]. All defendants were shareholders of either Hayes Microcomputer Products, Inc. or Access Beyond, Inc. before the Hayes Merger and all became shareholders of Hayes as a consequence of the Merger. ¶ 31. Moreover, each defendant was an active participant in both the Hayes Merger and the issuance of the Convertible Preferred Stock and, by virtue of their offices, directorships and stockholdings in Hayes, was in a position, individually and collectively, to control the actions of Hayes. ¶ 53.

tal of 15,000 Convertible Preferred Shares for $15,000,000. *Id.* The rights and obligations of the parties with respect to the Convertible Preferred Stock were controlled by the Hayes Certificate of Designations dated November 6, 1997 (the "Certificate"), which was part of Hayes' Certificate of Incorporation, the Preferred Stock Investment Agreement dated November 12, 1997 (the "Investment Agreement"), and a Registration Rights Agreement entered into on November 12, 1997 (the "Registration Rights Agreement"). ¶ 4. Collectively, these documents are referred to as the "Operative Documents." *Id.*

The Convertible Preferred Stock was not a registered security and was not publicly traded. ¶ 64. Accordingly, the only way to liquidate Preferred Shares was to convert them into Hayes Common Stock which could be sold on the public market. *Id.* Paragraph 4 of the Certificate provided for conversion by dividing the Liquidation Preference of $1,000 by the Conversion Price. ¶ 74. The Conversion Price was set at the lesser of a fixed price of $8 or a floating price computed by taking eighty-five percent of the Common Stock's trading value for the five-day period prior to the date of the Conversion Notice. ¶ 75.

The Investment Agreement acknowledged that Hayes' obligation to convert was "absolute and unconditional," regardless of any dilution caused by such conversion.[3] ¶ 92. However, the Certificate did

limit the amount of Preferred Stock that could be converted should the market price of the Common Stock fall below $15. ¶ 79. In that event, Preferred Stock investors could convert up to ten percent of their initial positions per month and, hence, their entire position over a ten-month period. *Id.* The Operative Documents contained no restrictions regarding the sale of Common Stock. *Id.*

The Certificate provided for specific performance to prevent or cure breaches of any of its provisions. ¶ 83. In addition to specific performance, the Operative Documents contained various other remedies should Hayes refuse to convert Preferred Shares into Common Stock. The Registration Rights Agreement provided that "[i]n the event that [Hayes], after receipt of a Conversion Notice ... is unwilling to issue such Common Shares ... in accordance with the terms of the Certificate for any reason", Hayes would pay plaintiffs a cash default payment. ¶ 105. Mandatory redemption was also an option in which Hayes was required to purchase any and all Preferred Shares for a mandatory purchase price if the Common Stock due upon conversion was not delivered within five trading days after the due date. ¶ 106. Hayes was also required to purchase the Preferred Shares if the default payments were not timely made. ¶ 108.

Through March 11, 1998, Elliott converted 1,099 Preferred Shares while Westgate converted 1,104 shares.[4] ¶ 125. Then,

---

3. Dilution would result from the issuance of additional shares of Common Stock which would lower defendants' percentage ownership in Hayes.

4. The actual dates of conversion, the corresponding number of preferred shares convert-

ed into common shares, and the conversion price are as follows:

| Date | Number of Preferred Shares Converted | Number of Common Shares | Conversion Price |
|---|---|---|---|
| Elliott: | | | |
| 11/12/97 | 45 | 3,482.000 | $12.92400 |

commencing with the April 13 and 16 attempted conversions, Hayes unilaterally dishonored its contractual obligations and refused to issue the Common Stock to which plaintiffs were entitled.[5] ¶ 126. Moreover, Hayes retained the Preferred Shares plaintiffs had submitted for conversion. *Id.*

### B. The Standstill Agreement and the New York State Action

On March 9, 1998, defendants induced Elliot and Westgate to enter into an agreement (the "Standstill Agreement") whereby Elliot and Westgate agreed not to exercise their contractual rights to engage in short sales and convert their Preferred Stock.[6] ¶ 13. The Standstill Agreement remained in effect until April 5, 1998. *Id.* Throughout that period, plaintiffs engaged—at the request of Hayes and defendants—in lengthy negotiations to amend the Operative Documents. *Id.* Plaintiffs lost substantial financial opportunities by refraining from engaging in short sales and/or converting their Preferred Stock. *Id.*

Then, on April 3, 1998, while the Standstill Agreement was still in effect, defendants caused Hayes to bring an action against Elliot and Westgate in New York State Supreme Court (the "New York State Action"). ¶ 55. Plaintiffs allege that Hayes made "frivolous allegations of misconduct, which were contradicted by the unambiguous provisions of the Operative Documents". ¶ 56. These allegations included that Elliot and Westgate received non-public confidential information, improperly engaged in short sales, and converted at improperly low conversion prices. *Id.* On June 11, 1998, Elliot and Westgate appeared in the New York State Action by serving their Answer and Counterclaims. ¶ 60. By stipulation dated October 8, 1998, all parties to the New York State Action, except for Dennis Hayes, agreed to dismiss the complaint and counterclaims without prejudice. ¶ 61.

### C. Defendants' Alleged Misrepresentations

Plaintiffs allege that defendants made deceptive and materially false and misleading statements by failing to disclose that they "had no intention of permitting Hayes to issue Common Shares upon conversion of the Convertible Preferred Stock if the result would be a material dilution of defendants' equity holdings." ¶ 135. The following summary reveals the number of times this allegation is repeated in the Complaint.

| | | | |
|---|---|---|---|
| 12/02/97 | 90 | 7,291.333 | $12.38400 |
| 02/09/98 | 609 | 74,575.333 | $ 8.28750 |
| 02/09/98 | 140 | 15,753.667 | $ 9.01875 |
| 03/11/98 | 215 | 36,983.000 | $ 5.92875 |
| **Westgate:** | | | |
| 11/12/97 | 45 | 3,482.000 | $12.92400 |
| 12/02/97 | 90 | 7,291.333 | $12.38400 |
| 02/09/98 | 609 | 74,575.333 | $ 8.28750 |
| 02/09/98 | 140 | 15,753.667 | $ 9.01875 |
| 03/11/98 | 220 | 37,843.000 | $ 5.92875 |

5. Elliott attempted to convert 10 Preferred Shares on April 13, 1998 and 10 more on May 7, 1998 while Westgate attempted to do the same on April 16, 1998 and May 7, 1998. By May 7, 1998, the conversion price had plummeted to $3.14500.

6. In a short sale, the investor makes an informed prediction that the price of a security will fall by a certain date. If that prediction comes true, the investor makes a profit, even though the value of the share declined.

¶ 10—But Hayes and the defendants never intended to permit Elliott and Westgate to obtain the full benefits of their contract with Hayes.

¶ 18—Hayes and the defendants never intended to permit Elliott and Westgate to enjoy the full benefit of their bargain, but, instead, intended to protect the economic interests of the defendants at the expense of Elliott and Westgate.

¶ 58—The frivolous and unsubstantiated allegations made by Hayes in the New York State Action demonstrate that defendants never had any intention of permitting Hayes to comply with its obligations to Elliott and Westgate, and that Hayes and the defendants intended to deny Elliott and Westgate the full economic value of the transaction.

¶ 76—The foregoing statements [made in paragraph 4 of the Certificate] were false and misleading, in that defendants never had any intention of permitting Hayes to comply fully with its obligation to convert Convertible Preferred Stock into Common Stock, and in that, from the outset, the defendants intended to prevent any such conversions to the extent they would substantially impair the equity holdings of the defendants in Hayes.

¶ 87—same as to representations and warranties made in the Investor Agreement.

¶ 102—The Registration Rights Agreement was false and misleading in that it failed to disclose that Hayes did not intend to convert Convertible Preferred Stock into Common Stock if such conversion would dilute the equity interests of the defendants, and that the defendants intended to prevent Hayes from effectuating such conversions.

¶ 113—The Board Resolutions [approving the Operative Documents and reserving the required number of Common Shares] were false and misleading in that they failed to disclose that Hayes did not intend to honor its obligation to convert Convertible Preferred Stock into Common Stock, and that defendants did not intend to permit Hayes to honor those obligations.

¶ 117—same as to opinion letter from Hayes' legal counsel confirming that Common Stock issued upon conversion would be validly issued, fully paid, and free of any preemptive rights.

## II. LEGAL STANDARD

Dismissal of a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999). "[T]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998) (quotation marks and citation omitted); *see also Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) ("The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (quotation marks and citation omitted). Nevertheless, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir.1996) (quotation marks and citations omitted).

■ To properly rule on a 12(b)(6) motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmoving party's favor. *See Harris,* 186 F.3d at 247. Moreover, the court must limit itself to facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference. *See Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1999). However, the court may also consider documents, while not explicitly incorporated into the complaint, that "plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 44 (2d Cir.1991)).

## III. DISCUSSION

### A. Rule 9(b) and the PSLRA's Pleading Requirements

#### 1. Pleading With Required Particularity

■ To state a claim under section 10(b) and Rule 10b–5,[7] plaintiffs must allege that in connection with the purchase or sale of securities: (1) defendants made a false material misrepresentation or omitted to disclose material information; (2) defendants acted with scienter; and (3) plaintiffs' reliance on the defendants' action caused the plaintiffs' injury. *See Koehler v. Bank of Bermuda (New York) Ltd.,* 209 F.3d 130, 136 (2d Cir.2000). "In order to

curtail the filing of meritless lawsuits, the PSLRA imposes stringent procedural requirements on plaintiffs pursuing private securities fraud actions." *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (internal quotation marks and citation omitted). *First,* with regard to scienter, the statute requires that,

[i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u–4(b)(2) (emphasis added). *Second,* with regard to material misstatements and omissions, the statute requires that,

[i]n any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading:

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation re-

---

7. Section 10(b) makes it unlawful

[t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 sets forth specific practices that are considered "manipulative or deceptive" including the following:

To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading

....

17 C.F.R. § 240.10b–5.

garding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1).

■■■ Plaintiffs cannot plead scienter [8] based on speculation and conclusory allegations—they "must allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995); *see also Novak*, 216 F.3d at 311 (PSLRA adopted Second Circuit's "strong inference" standard). Plaintiffs may do this by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or by alleging facts to show that defendants had both motive and opportunity to commit fraud. *See Rothman*, 220 F.3d at 90. Accordingly, the required inference of fraudulent intent arises where the complaint sufficiently alleges that the defendants:

(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*Novak*, 216 F.3d at 311 (internal citations omitted).

■■ In addition to the PSLRA pleading requirements, securities fraud actions are also subject to the pleading requirements of Rule 9(b). *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir. 1994). Rule 9(b) requires that the facts and circumstances constituting the alleged fraud be stated with particularity. Accordingly, under Rule 9(b) a complaint alleging securities fraud must: " '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

In short, under the heightened pleading requirements of Rule 9(b) and the PSLRA, plaintiffs must allege the first two elements of a securities fraud claim—fraudulent acts and scienter—with particularity. *See Gabriel Capital, L.P. v. NatWest Finance, Inc.*, 94 F.Supp.2d 491, 500 (S.D.N.Y.2000). However, the Second Circuit has held that

[d]espite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when the facts are peculiarly within the opposing party's knowledge. This exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. When pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard.

*Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990) (citations omitted).[9]

---

8. "The scienter needed in connection with securities fraud is intent 'to deceive, manipulate, or defraud,' or knowing misconduct." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 539 (2d Cir.1999) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996)).

9. Cited with approval in *Vento & Co. of New York v. Metromedia Fiber Network, Inc.*, No. 97 Civ. 7751, 1999 WL 147732, at *7 (S.D.N.Y. Mar. 18, 1999). Although *Wexner* is a pre-PSLRA case, the Second Circuit has stated that its "prior case law may be helpful in providing guidance as to how the 'strong

Thus, a complaint "which fails to adduce any specific facts supporting an inference of knowledgeable participation in the alleged fraud, will not satisfy even a relaxed standard." *Devaney v. A.P. Chester*, 813 F.2d 566, 569 (2d Cir.1987).

### 2. Group Pleading Doctrine

 The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint. *See Polar Int'l Brokerage Corp. v. Reeve*, 108 F.Supp.2d 225, 237 (S.D.N.Y.2000). The doctrine

> allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other *group-published information*, are the collective work of those individuals with direct involvement in the everyday business of the company.

*In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999) (internal quotation marks and citation omitted, emphasis added); *see also In re Livent Inc. Sec. Litig.*, 78 F.Supp.2d 194, 219 (S.D.N.Y.1999) (group pleading doctrine permits plaintiffs "to allege that misstatements contained in company documents may be presumed to be the work of the company's officers and directors"). Where the defendants are insiders, no specific connection between them and the fraudulent representations is necessary. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). Accordingly, where

> the defendants are a narrowly defined group of highly ranked officers or directors who participated in the preparation and dissemination of a [published company document], plaintiffs are not expected to bear the burden of having to identify the role of each defendant in the

inference' standard may be met." *Novak*, 216

fraud without the benefit of any discovery.

*Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1311–12 (S.D.N.Y.1996). However, the group pleading doctrine is extremely limited in scope. *Id.* One such limitation is that it applies only to group-published documents, such as SEC filings and press releases. *See In re Oxford Health Plans*, 187 F.R.D. at 142.

Here, plaintiffs rely on a group pleading theory, thereby avoiding the identification of the individual authors of the Operative Documents. Group pleading appears to be appropriate because the Operative Documents were group-published documents.

### B. Elements of Securities Fraud

#### 1. Material Omission—Intent Not to Perform

The heart of this Complaint is that defendants intentionally omitted to inform plaintiffs that Hayes would not convert plaintiffs' Preferred Shares if that conversion diluted defendants' control of Hayes. Plaintiffs allege that if they had known of defendants' true intent, they would not have entered into the Investment Agreement. Thus, the first question is whether plaintiffs have adequately alleged that defendants intentionally failed to disclose, at the time of the investment, that they intended to breach the contract by refusing to convert plaintiffs' Preferred Shares.

 It is well-established that "the failure to carry out a promise made in connection with a securities transaction is normally a breach of contract." *Mills*, 12 F.3d at 1176. To plead a claim of securities fraud, a plaintiff must allege that when the contract was made, the defendants "*secretly intended* not to perform or knew that [they] could not perform." *Id.* (em-

F.3d at 311.

phasis added); *see also Pross v. Katz*, 784 F.2d 455, 457 (2d Cir.1986) ("Making a specific promise to perform a particular act in the future while *secretly intending* not to perform may violate Section 10(b) ... if the promise is part of the consideration for a sale of securities.") (emphasis added). In order to sufficiently plead the defendants' intent to defraud, the Complaint must allege facts that raise a strong inference of fraudulent intent. *See Mills*, 12 F.3d at 1176; *Ouaknine v. MacFarlane*, 897 F.2d 75, 81 (2d Cir.1990). In cases involving nonperformance under a contract, "fraudulent intent may only be inferred 'when a defendant violates an agreement so maliciously and so soon after it is made that [its] desire to do so before [it] entered into the agreement is evident.'" *Campaniello Imports, Ltd. v. Saporiti Italia, S.p.A.*, 117 F.3d 655, 664 (2d Cir.1997) (quoting *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 185 (2d Cir.1995)).

 Here, plaintiffs have failed to allege that defendants "secretly intended not to perform." *Mills*, 12 F.3d at 1176. Indeed, there was nothing *secret* about the possibility that defendants would not perform. The Operative Documents expressly contemplated that Hayes might refuse to convert plaintiffs' Preferred Shares. The Registration Rights Agreement provided for mandatory redemption in the event that Hayes "for any reason" "is unwilling to issue" plaintiffs their Common Stock. *See supra* Part I.A. Given such explicit notice that Hayes might not fulfill its contractual obligations, plaintiffs cannot allege facts supporting the inference that Hayes or defendants *secretly intended* not to perform.

*Gorra Holding v. Nu–Tech Bio–Med, Inc.*, No. 98 Civ. 0764, 1999 WL 4922 (S.D.N.Y. Jan. 5, 1999), provides further support for dismissal. In *Gorra*, the parties entered into an agreement whereby plaintiffs purchased 14,000 shares of Nu–Tech Bio–Med, Inc. ("NTBM") preferred stock, which were to be convertible into common stock. *See id.* at *1. NTBM was obliged to file a Registration Statement with the SEC that covered the conversion shares so they could be freely traded. *See id.* at *1. Although the individual defendants—officers and directors of NTBM— initially filed such a statement, they withdrew it immediately before it became effective. *See id.* at *2. The plaintiffs alleged that the defendants engaged in this fraud, among other reasons, "to prevent the exercise of [plaintiffs'] conversion option so as to protect the value of [the individual defendants'] own shares and prevent the plaintiffs from gaining control of the Company." *Id.* at *2. The *Gorra* court found that "the failure to register shares alone does not support an action for securities fraud." *Id.* at *4. In dismissing plaintiffs' section 10(b) claim, the court noted

both parties were aware that NTBM had a finite number of unissued common stock, and that any downward fluctuation in the market value would result in the need for more conversion shares. Therefore, both parties were aware that at some point a low market value could result in an inadequate number of conversion shares for conversion at that value. Understanding such, NTBM *was under no obligation to disclose this fairly obvious information.*

*Id.* at *3 (emphasis added). Like the defendants in *Gorra Holding*, defendants here were under no obligation to disclose that which was explicitly contemplated and mentioned in the Operative Documents— that Hayes might, at some future date, be "unwilling" to honor plaintiffs' request to convert their shares.

 Furthermore, plaintiffs' factual allegations have not raised the required strong inference that defendants secretly

.

intended not to perform. *First,* defendants consistently converted plaintiffs' Preferred Shares, as requested, for four months after executing the Agreement. Hayes honored plaintiffs' conversion notices of November 12, 1997, December 2, 1997, February 9, 1998, and March 11, 1998. In total, of the 15,000 shares of Preferred Stock which plaintiffs owned, Hayes converted 2,203 shares. *See supra* note 4. This is compelling evidence that Hayes intended to perform initially, thus negating any inference of fraudulent intent. *See KNK Medical–Dental Specialities, Ltd. v. Tamex Corp.,* No. 99 Civ. 3409, 2000 WL 1470665, at \*4 (E.D.Pa. Sept. 28, 2000) (defendant's "partial performance is evidence that at the time [it] entered into the contract, it intended to perform"). While defendants may have been financially motivated to stop converting once the shares of Hayes Common Stock fell below a certain level, proof of a "financial incentive for breaching does not turn a contract claim into a fraud or conspiracy claim." *Creaciones Con Idea, S.A. de C.V. v. MashreqBank PSC,* 51 F.Supp.2d 423, 429 (S.D.N.Y.1999).

*Second,* because "a contract may be breached for legitimate business reasons", its breach "does not bespeak fraud." *Mills,* 12 F.3d at 1176. As plaintiffs admit, although Hayes Common Stock dropped in price—from $12.924 per share in November 1997 to $3.145 in May 1998—plaintiffs could continue to make a profit by engaging in short sales. *See* Complaint ¶ 8. Therefore, Hayes' legitimate business reason for refusing to convert plaintiffs' Preferred Stock was to halt the sharp drop in the price of Hayes Common Stock by eliminating plaintiffs' financial incentive to drive the price of Hayes Common Stock down.[10]

Plaintiffs, however, argue that the Standstill Agreement and the New York State Action "demonstrate[ ] the manifest bad faith of defendants, thereby establishing that they never intended to permit Hayes to perform its obligations." Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.Mem.") at 4. Even drawing every inference in plaintiffs' favor, plaintiffs' argument requires an impossible leap of logic. Assuming, arguendo, that the Standstill Agreement and the New York State Action evidence defendants' bad faith, these actions do not demonstrate defendants' fraudulent intent at the time that the Investment Agreement was made. Rather, the Standstill Agreement and the New York State Action confirm that four months after executing the Investment Agreement, defendants sought to disrupt plaintiffs' short sales, which defendants perceived were contributing, at least in part, to the downward spiral in the value of Hayes Common Stock. This legitimate business reason demonstrates that an inference that defendants secretly intended not to perform is not warranted here. *See Campaniello Imports,* 117 F.3d at 664 (holding that an inference of fraudulent intent is inappropriate where defendant's poor performance of its contractual

**10.** Defendants explain that this financial incentive to lower the stock price may result in a "Death Spiral":

> Because mass-selling by large stockholders drastically depresses the market price, the resulting market free-fall is often referred to colloquially in the financial press as a "Death Spiral." The primary beneficiaries of Death Spirals are the shareholders of convertible preferred stock who can reap tremendous financial gains through short sales and option trades while the company's stock plummets in value, knowing they have a ready supply of even cheaper stock.

Memorandum of Law of All Defendants in Support of their Motion to Dismiss the Complaint in its Entirety Pursuant to Rule 12 of the Federal Rules of Civil Procedure ("Def.Mem.") at 5–6.

obligations can be explained by the fact that defendant recently declared bankruptcy); *Ouaknine*, 897 F.2d at 81 (finding that defendants intended to defraud where "[i]t is difficult to imagine how such events could have occurred if the defendants who controlled them had not actually intended to defraud."); *Falik v. Parker Duryee Rosoff & Haft*, 869 F.Supp. 228, 235 (S.D.N.Y.1994) (stating that strong inference of fraud is not warranted where legitimate business reasons explain defendants' nonperformance).

### 2. Scienter

### a. Conscious Misbehavior or Recklessness

 To survive dismissal by pleading conscious misbehavior or recklessness, plaintiffs must allege that defendants' conduct was "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir.2000) (quotation marks and citation omitted). Recklessness must be shown to such an extent that a reasonable finder of fact could actually infer fraudulent intent from it. *See Shields*, 25 F.3d at 1128; *see also Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982) (recklessness "must, in fact, approximate an actual intent to aid in the fraud being perpetrated"). Where a plaintiff relies on allegations of recklessness—as opposed to motive and opportunity—to plead fraudulent intent, "the strength of the circumstantial allegations must be correspondingly greater." *In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610, 1999 WL 178749, at *8 (S.D.N.Y. Mar. 31, 1999)

(citing *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987)).

 Here, plaintiffs allege that defendants "knowingly, deliberately and/or recklessly deceived Elliot and Westgate" by "failing to disclose that, under certain conditions, conversion notices from Elliot and Westgate would not be honored." Complaint ¶ 19. The Complaint merely repeats the word "recklessly" wherever plaintiffs allege knowing, intentional or deliberate conduct without providing any factual allegations demonstrating that defendants' conduct was reckless. *See, e.g., id.* ¶ 134 ("Defendants, singly and in concert, directly or indirectly engaged in a common plan, scheme and unlawful course of conduct pursuant to which they intentionally, knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Elliot and Westgate."). Such bald assertions do not constitute adequate allegations of scienter. *See Glickman v. Alexander & Alexander Servs. Inc.*, No. 93 Civ. 7594, 1996 WL 88570, at *14 (S.D.N.Y. Feb. 29, 1996) ("[P]laintiff's repeated assertions that defendants 'knew or recklessly failed to know' that a fraudulent scheme was afoot are 'so broad and conclusory as to be meaningless.' These assertions fail in every instance to connect the underlying set of facts concerning ... inaccurate reporting to any conscious misconduct or recklessness approximating fraud.") (quoting *Shields*, 25 F.3d at 1129).

Indeed, in their memorandum of law, plaintiffs devote only one paragraph—quoted in full below—to demonstrate the factual basis for their allegations of recklessness:

> Elliot and Westgate have also alleged sufficient facts to establish strong circumstantial evidence of conscious misbehavior or recklessness. Shortly after the Operative Documents were execut-

ed, Defendants misled Elliot and Westgate into entering into the Standstill Agreement, and caused Hayes to commence the New York State Action, in which Hayes made frivolous allegations against Elliot and Westgate. Such conduct underscores the manifest bad faith exhibited by the defendants.

Pl. Mem. at 16.

The conclusory nature of plaintiffs' argument is self-evident. Plaintiffs merely repeat the two facts they believe place defendants in a poor light—the Standstill Agreement and the New York State Action—and contend that these actions support an inference of recklessness. However, plaintiffs have not alleged that at the time the Investment Agreement was executed defendants knew that Hayes would not honor plaintiffs' conversion notices. *See Shields*, 25 F.3d at 1129 (holding that plaintiff did not adequately allege recklessness where "allegations do not say . . . that the [defendant's] disclosures were inconsistent with current data"). Rather, plaintiffs' pleading technique is merely another example of the type of "fraud by hindsight" rejected by this Circuit. *See, e.g., Novak*, 216 F.3d at 309 ("[W]e have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' ") (citing *Stevelman*, 174 F.3d at 85).

Moreover, the factual basis for plaintiffs' allegations of recklessness—explicitly stated for the first time in plaintiffs' memorandum of law—does not support an inference of recklessness. Even assuming that the Standstill Agreement and the New York State Action evidence defendants' bad faith, bad faith is not equivalent to recklessness. Furthermore, to infer that actions taken in bad faith four months after entering the Investment Agreement somehow constitute recklessness at the time the Investment Agreement was made "simply demands too strenuous an exertion of the

imagination." *Glickman*, 1996 WL 88570, at *13 (citation omitted). At best, viewed in the light most favorable to plaintiffs, these actions demonstrate that defendants negligently and mistakenly believed that Hayes Common Stock would not decline in price. Allegations of negligence, however, do not raise a strong inference of fraud. *See Shields*, 25 F.3d at 1129 ("The pleading strongly suggests that the defendants should have been more alert and skeptical, but nothing alleged indicates that management was promoting a fraud.").

### b. Motive and Opportunity

The Second Circuit has defined motive and opportunity as follows: "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130.

Plaintiffs contend that defendants

*were motivated by a desire to protect their financial interests and preserve their control over Hayes.* Defendants and Hayes recognized that, because of Hayes' precarious financial condition, it would be difficult, if not impossible, to obtain the financing Hayes needed from traditional sources, and without providing investors the opportunity to convert their securities into Common Stock which could be sold at a profit.

Complaint ¶ 7 (emphasis added). Moreover, the defendants allegedly had the opportunity to perpetrate the fraud because they negotiated the terms of the Merger and the Operative Documents. *See* Pl. Mem. at 16.

A court, "[i]n looking for a sufficient allegation of motive, . . . assume[s] that the defendant is acting in his or her

informed economic self-interest." *Shields,* 25 F.3d at 1130. Thus, courts within this Circuit have long held that allegations of generic motivations typically held by similarly-positioned executives are insufficient to establish motive. *See, e.g., In re American Bank Note Holographics, Inc. Sec. Litig.,* 93 F.Supp.2d 424, 445 (S.D.N.Y. 2000) ("Generic allegations that seek to infer motive from benefits that are generally held by similarly situated executives have been routinely rejected by courts as insufficient to show motive."); *Grossman v. Texas Comm. Bancshares, Inc.,* No. 87 Civ. 6295, 1995 WL 552744, at *11 (S.D.N.Y. Sept. 15, 1995). Accordingly, in *Glickman,* 1996 WL 88570, at *6, this Court held that an institutional defendant's alleged motive of "rais[ing] much needed capital" and an executive's motive of "preserv[ing] his financial interests and other benefits of his position[ ]" are too generalized to support an inference of scienter. This Court has also held that controlling shareholders' alleged motive of maintaining their eighty percent control over a company in order to realize certain tax benefits was insufficient to constitute motive. *See Fant v. Perelman,* No. 97 Civ. 8435, 1999 WL 199078, at *4 (S.D.N.Y. Apr. 9, 1999) ("[I]t is well-established that defendants' failure to disclose an entrenchment motive or an entrenchment scheme is not actionable under federal securities laws.").

■ Here, plaintiffs' allegations that defendants sought to retain their equity control over Hayes while raising much needed capital "are of the generalized, commonplace nature that the courts within this circuit have found to provide an insufficient basis for an inference of scienter." *Glickman,* 1996 WL 88570, at *6. Executives and controlling shareholders typically seek to maximize their equity control over a company. Such a generalized motive "is not sufficiently concrete for purposes of inferring scienter." *Chill v. General Elec. Co.,* 101 F.3d 263, 268 (2d Cir.1996) (holding that generalized motive of justifying investment and having it appear profitable is not sufficiently concrete).

■ Moreover, plaintiffs' claim of motive is not supported by the allegations. The Complaint does not indicate what percentage ownership defendants had as of April 13, 1998, April 16, 1998, and May 7, 1998—the dates on which defendants refused to convert plaintiffs' Preferred Shares. Nor does the Complaint allege what effect conversion of twenty shares of Preferred Stock—as plaintiffs requested in April and May, 1998—would have had on defendants' equity control of Hayes.[11] De-

---

11. Although the Complaint does not mention any of these essential factual allegations, plaintiffs' memorandum of law attempts to fill in the gaps. Plaintiffs state:

> By March 1998 ... the Conversion Rate had dropped to $5.92875, thereby permitting the holders of Convertible Preferred Stock to convert, *over time,* their shares into approximately 7.6 million shares of Common Stock, thereby diluting the ownership interest of the individual defendants to only 53.6%.... [B]y May 1998, the conversion price had dropped to $3.14500, threatening, *over time,* to dilute the equity interests of the defendants to approximately 43%.

Pl. Mem. at 8–9 (emphasis added).

*First,* these allegations are not made in the Complaint and cannot be considered by this Court. *See Friedl v. City of New York,* 210 F.3d 79, 83–4 (2d Cir.2000) ("[A] district court errs when it ... relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.") (citing *Fonte v. Board of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir. 1988)). *Second,* even if these allegations could be considered, they do not support plaintiffs' allegation of motive. The allegation that defendants' control would be diluted "over time" does not suggest that defendants were in imminent danger of losing their equity control over Hayes when they refused to convert plaintiffs' Preferred Shares. There-

fendants merely allege, in conclusory fashion, that "in the event of a drop in the price of Common Stock ... the equity position of defendants would be diluted by the conversion of Convertible Preferred Stock into Common Stock." Complaint ¶ 8. Absent more specific factual allegations, plaintiffs' allegations of motive are merely speculative assertions that fail to satisfy the heightened pleading requirements for scienter. *See Chill*, 101 F.3d at 267 (under Rule 9(b), "[p]laintiffs still have the 'burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter.'") (quoting *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.1994)).

### 3. Justifiable Reliance

Plaintiffs contend that they justifiably relied to their detriment on defendants' material omissions: "Had Elliot and Westgate known the true intentions of the defendants, that they did not intend to permit Hayes to honor its conversion obligations under the Operative Documents, Elliot and Westgate would never have agreed to invest the $15,000,000 in Hayes in the first place." Complaint ¶ 20. Because I have already concluded that plaintiffs have not alleged, with sufficient factual support, that defendants secretly intended not to perform, *see supra* Part III.B.1, there is no material omission

on which plaintiffs could have justifiably relied.[12]

### C. Controlling Person Liability

To establish controlling person liability under section 20(a) of the 1934 Act, plaintiffs must allege

> a primary violation by the controlled person and control of the primary violator by the targeted defendant, *and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.* Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.

*First Jersey Sec. Inc.*, 101 F.3d at 1472 (citations and internal alterations omitted, emphasis added).

I need not decide whether the individual defendants exercised sufficient control over Hayes as I have already found a failure to adequately allege a primary violation of section 10(b) or Rule 10b–5.[13] Because plaintiffs have not properly pled a primary violation of the federal securities laws, their derivative claim for controlling person liability under section 20(a) must be dismissed. *See The High View Fund, L.P.*

---

fore, plaintiffs' allegation of motive is belied by the fact that defendants' conversion notices in April 1998 and May 1998 would not have threatened defendants' equity control over Hayes.

**12.** If plaintiffs had adequately pled defendants' intent to defraud, then reliance on that material omission would have been presumed. As the Supreme Court stated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972):

> [P]ositive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

**13.** "Officer or director status alone does not constitute control." *In re Livent, Inc. Sec. Litig.*, 78 F.Supp.2d at 221.

*v. Hall,* 27 F.Supp.2d 420, 428 (S.D.N.Y. 1998).

### D. Plaintiffs' State Law Claims

Because there is no viable federal claim, I decline to exercise supplemental jurisdiction over plaintiffs' state law claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (where all federal claims are dismissed before trial, the state claims should be dismissed as well); *see also Martinez v. Simonetti,* 202 F.3d 625, 636 (2d Cir.2000) (directing dismissal of supplemental state law claims where no federal claims remained). Accordingly, these claims are also dismissed.[14]

### E. Leave to Amend

■ Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." "Although the decision whether to grant leave to amend is within the discretion of the district court, refusal to grant leave must be based on solid ground." *Oliver Sch., Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991). Futility provides a solid ground on which to deny leave to amend. *See Chill,* 101 F.3d at 272 (citing *Acito,* 47 F.3d at 55 (leave to amend properly denied where court examined plaintiff's supplementary allegations and determined that additional information did not cure the complaint)).

■ "When a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.'" *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir. 1990) (quoting Moore & Lucas, *2A Moore's*

*Federal Practice* ¶ 12.14 at 12–99 (2d ed.1989)). However, plaintiffs have not requested leave to amend their Complaint, and it is not an abuse of the Court's discretion "to order a case closed when leave to amend has not been sought." *Campaniello Imports,* 117 F.3d at 664 n. 3 (quoting *Shields,* 25 F.3d at 1132). Moreover, amendment would be futile. Even if plaintiffs can amend their pleadings to adequately allege scienter—which I very much doubt—no *secret* intent to defraud them can be alleged because the Operative Documents explicitly contemplated defendants' refusal to honor plaintiffs' conversion notices. Accordingly, leave to amend is denied.[15]

## IV. CONCLUSION

The Complaint is hereby dismissed in its entirety. The Clerk of the Court is directed to close this case.

SO ORDERED.

---

14. Because this Court declines to exercise supplemental jurisdiction over plaintiffs' state law claims, it is unnecessary to reach the merits of those claims.

15. Because the Complaint is dismissed without leave to amend, I do not address the

merits of defendants' other grounds for dismissal: that the section 10(b) and 20(a) claims against Dennis Hayes are barred by the statute of limitations, and that the Court lacks personal jurisdiction over defendants.