John FAULKNER, William Campaigne; Harry Haidet; Coolidge C. Elder as Trustee on Behalf of the Coolidge C. and Hildegard N. Elder Revocable Trust; Eugene T. Beynon; Charles R. Berkley as Trustee on Behalf of the Charles R. Berkley and Geraldine E. Berkley Revocable Trust; George Hoffman; and Rayford M. Shelton, Plaintiffs,

v.

VERIZON COMMUNICATIONS, INC., Defendant.

No. 01 CIV.1846(WCC).

United States District Court, S.D. New York.

March 22, 2002.

Lowey Dannenberg Bemporad & Selinger, P.C. (Stephen Lowey, Esq., Richard Bemporad, Esq., David C. Harrison, Esq., Michelle Rago, Esq., Of Counsel), White Plains, NY, for Plaintiffs.

Kirkland & Ellis (William H. Pratt, Esq., Frank Holozubiec, Esq., Vickie Reznik, Esq., Of Counsel), New York City, for Defendant.

### OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiffs, purchasers of publicly traded notes issued by NorthPoint Communications Group, Inc. ("NorthPoint"), bring the instant action against defendant Verizon Communications, Inc. ("Verizon") pursuant to § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, for alleged fraudulent misrepresentations in connection with a contemplated merger with NorthPoint. In *Faulkner v. Verizon*, 156 F.Supp.2d 384 (S.D.N.Y.2001) (*Faulkner I*), this Court granted Verizon's motion to dismiss the Complaint but granted plaintiffs leave to amend. Plaintiffs accordingly filed an Amended Complaint on September 13, 2001. Verizon now moves to dismiss the Amended Complaint. For the reasons that follow, Verizon's motion is granted.

### BACKGROUND

Unless otherwise noted, the following facts are gleaned from the Amended Complaint.

This suit is based on the merger agreement between Verizon and NorthPoint, agreed to by the corporations in 2000 and scheduled to close in 2001 (the "Merger Agreement").

Plaintiffs, individually and on behalf of a represented class, purchased 12⅞ % Senior Notes issued by NorthPoint (the "Notes"), between August 8, 2000, the date that Verizon and NorthPoint jointly announced their Merger Agreement, and November 29, 2000, the date Verizon terminated the Merger Agreement (the "Class Period").

(Am.Complt.¶ 2.) Plaintiffs purchased the notes at prices between 0.9275 and 0.9850 times their face value. (Complt.¶ 12.)[1] The Notes contained a "change of control" feature which obligated NorthPoint to offer to purchase the Notes at 101% of the aggregate principal amount plus accrued and unpaid interest if the consummation of a transaction, *e.g.*, a merger, resulted in another entity owning more than 50% of the total voting stock or total common equity of the company. (Am.Complt. ¶¶ 28–29.)

Verizon is the resulting entity of the merger of Bell Atlantic Corporation and GTE Corporation, completed on June 30, 2000. (*Id.* ¶ 21.) It is the largest provider of wireline and wireless communications in the United States. (*Id.*) NorthPoint, a Delaware corporation headquartered in San Francisco, California, was a fast-growing, nationwide provider of digital subscriber line ("DSL") services. (*Id.* ¶ 23.) NorthPoint's networks used DSL technology to enable data transport over telephone company copper lines at speeds up to 25 times faster than dial-up modems. (*Id.* ¶ 24.) As a start-up DSL service provider, NorthPoint had incurred massive losses and negative cash flow. In fact, NorthPoint had reported increasing net losses of $80 million, $112 million and $136 million for the first, second and third quarters of the 2000 fiscal year. (*Id.* ¶ 34.) In accordance with the securities laws, it repeatedly advised its investors that it expected its operating expenses and losses to increase in the future. (*Id.* ¶¶ 32–33.)

## I. *Merger Between Verizon and North-Point*

In *Faulkner I*, 156 F.Supp.2d at 387–90, this Court discussed the facts underlying the Merger Agreement, related public statements and Verizon's ultimate withdrawal from the agreement. However, because the allegations in the Amended Complaint present these facts in a different light, they bear repeating here.

On August 7, 2000, Verizon and NorthPoint entered into a Merger Agreement and related Funding Agreement. (*Id.* ¶ 3.) The basic terms of this Merger Agreement were first proposed by Verizon President and Vice–Chairman Lawrence Babbio to NorthPoint President and Chief Executive Officer ("CEO") Elizabeth Fetter in April 2000. (*Id.* ¶ 6.) For Babbio, the merger with NorthPoint was important for strategic reasons, and he was willing to overlook NorthPoint's substantial cash flow deficits. (*Id.* ¶ 7.) A term sheet prepared by Babbio was agreed to by Fetter at a meeting in Paris, France in June of 2000 (*Id.* ¶ 6.)

The Merger Agreement provided for a merger of Verizon and NorthPoint's DSL businesses. Prior to the merger, Verizon was to contribute $800 million in cash and more than $500 million of Verizon DSL assets to NorthPoint. (*Id.* ¶ 36.) Verizon, in exchange, would receive 55% equity interest in NorthPoint. (*Id.*) In conjunction with the Merger Agreement, Verizon and NorthPoint entered into a related Funding Agreement by which Verizon agreed to provide interim financing of $200 million in senior secured debt to NorthPoint by January 1, 2001, and to purchase $150 million of NorthPoint nonvoting 9% convertible stock. (*Id.* ¶ 37.)

Under the terms of the Merger Agreement, Verizon agreed "to use all commercially reasonable efforts to take ... [actions] necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this merger." (*Id.* ¶ 38.) The Merger Agreement included a "Termination Date" of August 7, 2001. (*Id.*

---

**1.** "Complt." refers to the original Complaint in this action.

¶ 39.) The Merger Agreement also contained a relevant provision in which both parties agreed not to "issue any press release or public statement with respect to this [Merger] Agreement or the transactions contemplated hereby . . . without prior consent." (*Id.* ¶ 40.) In addition, because Verizon's funding was critical to the continued viability of NorthPoint's business, NorthPoint executives insisted that Verizon's right to unilaterally terminate the merger be extremely limited. (*Id.* ¶¶ 41–42.) The Merger Agreement placed limitations on Verizon's ability to terminate for NorthPoint's breach or failure to perform. (*Id.* ¶¶ 42–43.) Verizon was also given a circumscribed right to terminate in the event of a "Material Adverse Effect," defined as "any fact, event, change or effect having, or which will have, a material adverse effect on the business, operations, properties . . . financial condition, assets or liabilities of NorthPoint." (*Id.* ¶ 44.) [2]

On August 8, 2000, Verizon and North-Point jointly announced the proposed merger. (*Id.* ¶ 52.) Verizon proclaimed that the merger represented a "groundbreaking agreement to fundamentally change the dynamics of the broadband industry." (*Id.* ¶ 54.) Babbio declared that the deal "combines complementary assets—Verizon's position in the consumer market and NorthPoint's presence with business customers—to provide the scale to fuel growth and deliver the full benefits of high speed connections." (*Id.*) Verizon and NorthPoint also represented that the "companies anticipate completing the transaction by mid–2001." (*Id.* ¶ 55.) Verizon CEO Ivan Seidenberg lauded the

merger as one which "will take us a long way toward achieving national scale in our broadband operations and putting another 'piece of the bundle in place.' " (*Id.* ¶ 57.) Also on August 8, 2000, NorthPoint announced its financial results for the second quarter ending June 30, 2000, reporting a net loss of about $112 million and EBITDA of negative $79 million on revenues of $24 million. (*Id.* ¶ 59.)

According to plaintiffs, within days of signing the Merger Agreement, Stephen Smith, Verizon Vice–President for Business Development and the lead business negotiator of the merger, raised in an internal memorandum sent to senior management the question of whether Verizon should let NorthPoint go bankrupt and then buy NorthPoint cheaply in bankruptcy rather than consummate a merger. (*Id.* ¶ 103.)

In response to the merger announcement, the market price of the Notes increased from approximately $600 to approximately par value, or $1,000, in anticipation of NorthPoint's purchase of the Notes following the merger's trigger of the change of control provision. (*Id.* ¶ 53.) Conversely, however, the market price of Verizon stock plummeted. On August 7, 2000, Verizon stock closed at a price of $47⅞ per share while on August 8, 2000, the stock closed at a price of $42½ per share. On August 9, 2000, the price of Verizon stock closed at $40⅜ per share. (Complt.¶ 57.)

Despite the negative market reaction, on August 14, 2000 Verizon filed its Form 10–

---

**2.** Plaintiffs allege that the initial proposals allowed Verizon to terminate if there was a material adverse effect on NorthPoint's "prospects." However, NorthPoint argued that this definition was too broad, advising Verizon that a sudden termination of the merger would result in NorthPoint's bankruptcy.

The word "prospects" was therefore eliminated from the definition of "Material Adverse Effect." (*Id.* ¶¶ 46–48.) However, plaintiffs maintain that Verizon had no intention of abiding by the restrictions on Verizon's ability to terminate the merger. (*Id.* ¶¶ 50–51.)

Q, elaborating on the details of the merger, and reiterating its commitment to complete the merger in mid–2001. (Am. Complt.¶ 58.) On September 6, 2000, NorthPoint and Verizon issued a joint press release announcing that Verizon had provided NorthPoint with $150 million in funding through the purchase of preferred stock, and once again stated that the "companies expect the deal to close by mid–2001." (*Id.* ¶ 67.) NorthPoint issued its own press release, approved by Verizon, which represented that "[t]he pre-merger investment—along with an additional $200 million in debt financing committed by Verizon and to be made available to North-Point after January 1, 2001—are expected to fulfill NorthPoint's funding requirements beyond the targeted close of the merger in mid–2001." (*Id.* ¶ 68.) This $150 million purchase of NorthPoint stock was the only payment made by Verizon in fulfillment of its obligations under the Merger Agreement. (*Id.* ¶ 69.)

Plaintiffs allege that this "one-shot" investment was implemented as part of an undisclosed strategy "not to honor the restrictions placed on Verizon's ability to unilaterally terminate the Merger Agreement." (*Id.* ¶ 71.) According to plaintiffs, the investment was made in order to allow Verizon employees access to NorthPoint's facilities to absorb NorthPoint's business and trade secrets, making Verizon better able to operate its own DSL business once it forced NorthPoint into bankruptcy by terminating the merger. (*Id.*) In support of this allegation, plaintiffs identify another internal memorandum from early October 2000, again sent by Smith to Verizon senior management, proposing that Verizon "seek to 'regain 100% [instead of 55%] and full control of our DSL business.'" (*Id.* (brackets in original).) This proposal was prompted by a determination that "'the market would respond positively' if Verizon had a 'much greater upside to

earnings thereafter (as [Verizon] captures 100% of the DSL business growth).'" (*Id.*) Plaintiffs further state that despite this "undisclosed strategy," Verizon continued to publicly extol the merger.

On October 26, 2000, NorthPoint issued its third-quarter earnings, reporting operating and net losses of $106 million and $125 million, respectively, on revenues of $30 million. (*Id.* ¶ 74.) In the earnings release, NorthPoint, with Verizon's approval, reconfirmed that they "continue[d] to be on track with [the] prior expectation of doing the [merger] in the first half of 2001." In the weeks after this release, NorthPoint advised Verizon that, as a result of the worsening financial conditions of certain distributor customers, North-Point would revise downward the previously announced third-quarter earnings. (*Id.* ¶ 76.) After being advised of NorthPoint's decision to revise third-quarter results, Verizon Telecom Chief Financial Officer Doreen Toben reportedly advised North-Point Chief Financial Officer Glinsky on November 13, 2000 that "Verizon was in." (*Id.* ¶ 78.) The next day, on November 14, 2000, Verizon filed its Form 10–Q for the quarter ending September 30, 2000 in which Verizon reconfirmed that, "[w]e expect the Merger to close in 2001." (*Id.*) On November 20, 2000, NorthPoint obtained approval from Verizon to issue a press release announcing the revised third-quarter earnings and stating that, "we continue to be on track with our prior expectation of closing the Verizon transaction in the first half of 2001." (*Id.* ¶ 79.)

On November 29, 2000, Verizon announced that it was unilaterally terminating the Merger Agreement as a result of a "Material Adverse Effect" on NorthPoint's business due to the revision of its third-quarter earnings. (*Id.* ¶ 82.) Plaintiffs contend that this reason was merely pretextual, and that the revised earnings were

consistent with NorthPoint's trend of increasing losses. (*Id.*) "Moreover, a change in NorthPoint's short-term prospects was specifically excluded from the definition of a Material Adverse Effect in the Merger Agreement." (*Id.* ¶ 83.) Following the termination of the merger, Verizon launched its own aggressive sales and marketing strategy to expand Verizon's DSL business "and to exploit the damage done to NorthPoint by Verizon's bad-faith termination." (*Id.* ¶ 85.)

On November 29, 2000, Verizon filed a lawsuit against NorthPoint in Delaware Superior Court seeking a declaratory judgment that NorthPoint's financial condition did indeed constitute a Material Adverse Effect justifying termination of the Merger Agreement. *Verizon Communications, Inc. v. NorthPoint Communications Group, Inc.*, Civ. No. 00C–11–240. According to plaintiffs, "[t]hat lawsuit had been in preparation for many days, if not weeks, before filing." (*Id.* ¶ 88.) NorthPoint filed its own lawsuit on December 8, 2000 in the California Superior Court in San Francisco County, *North Point Communications Group, Inc. v. Verizon Communications, Inc.*, Case No. 317249, asserting claims of fraud and breach of contract against Verizon (the "*NorthPoint* California Complaint"). (*Id.* ¶ 89.)

By January 10, 2001, the Notes were trading for less than 10% of face value, or less than $100 per Note, in light of the expectation that NorthPoint would default on its next interest payment. (*Id.* ¶ 90.) On January 16, 2001, NorthPoint filed for Chapter 11 bankruptcy, *In re NorthPoint Communications Group, Inc.*, Case No.

01–3207 (Bankr.N.D.Cal.), and was forced to conduct a sale of its assets. Verizon, although given a right of first refusal, declined to purchase NorthPoint's assets which were ultimately sold to AT & T. (*Id.* ¶ 92.)

## II. *Faulkner I*

The original Complaint did not contain any allegations with respect to Verizon's "undisclosed strategy" not to honor the Merger Agreement in order to allow NorthPoint to go bankrupt and buy it cheaply out of bankruptcy.[3] (*Id.* ¶ 9.) Instead, plaintiffs focused on the time period between November 14, 2000, when Verizon issued its Form 10–Q after NorthPoint's decision to revise its third-quarter earnings, and November 29, 2000, when Verizon terminated the merger. Plaintiff's theory of recovery in the original Complaint was that Verizon had soured on the deal before November 14 and was exploring ways to justify terminating the deal and its funding obligations. (Complt.¶ 56.) This rendered Verizon's statements in its November 14, 2000 Form 10–Q, and the statements it approved in NorthPoint's November 20, 2000 press release, materially false and misleading and thus actionable under Rule 10b–5. (*Id.* ¶¶ 50, 51, 56, 76–81.)

In support of our holding that plaintiffs had failed to adequately allege a viable theory of scienter,[4] we explained:

[w]e cannot perceive any concrete benefits Verizon could realize by deceiving NorthPoint investors into believing that the merger was expected to proceed. Just the contrary, Verizon would obvi-

---

**3.** After defendant had moved to dismiss the Complaint, plaintiffs did call this Court's attention to NorthPoint's allegations in its California Complaint that supported this theory. We declined to take judicial notice of these pleadings, but noted that "no allegations as-

serted therein would call into question our decision today." *Faulkner I*, 156 F.Supp.2d at 397 n. 6.

**4.** *See* discussion *infra* Part II.

ously have benefitted by announcing its withdrawal from the merger immediately after learning of NorthPoint's revised third-quarter figures. The statements in Verizon's Form 10–Q and press release that it intended to proceed with the merger had the effect of substantially depressing its stock prices.... We fail to understand plaintiffs' theory of liability: apparently they have confused an innocent motive to terminate with the requisite motive to defraud.

*Faulkner I*, 156 F.Supp.2d at 394. Moreover, we held that the Complaint provided "no factual basis to support the claim that prior to November 14, 2000, Verizon had changed its mind and decided to terminate the merger." *Id.* at 396. Furthermore, we held that all of the statements upon which plaintiffs relied were "expressions of optimism concerning an uncertain future event" and thus not actionable under 10b–5.[5] *Id.* at 397–401. We therefore granted Verizon's motion to dismiss the Complaint, and granted plaintiffs leave to amend.

### III. *Amended Complaint*

In the Amended Complaint, plaintiffs attempt to cure the pleading deficiencies in the original Complaint by alleging an alternate theory of liability. Plaintiffs maintain that these allegations are based on information derived, *inter alia*, from interviews with former NorthPoint senior executives, information gleaned from the *NorthPoint* California Complaint, public documents and consultations with an expert. (Am.Complt.¶ 1.) According to the Amended Complaint, all of Verizon's public statements with respect to the proposed merger (as well as NorthPoint's statements approved by Verizon) were materially misleading because they failed to disclose Verizon's secret intent to ultimately refuse to honor the Merger Agreement

and thereby drive NorthPoint into bankruptcy. (*Id.* ¶ 105.) Plaintiffs contend that the existence of this secret intent is supported by the internal memoranda sent by Smith to Verizon senior management affirming' an alternate business strategy. (*Id.* ¶¶ 103–04.) Plaintiffs further maintain that as a result of Verizon's failure to disclose their secret intent, the price of the Notes was artificially inflated throughout the Class Period, thereby causing injury to plaintiffs. (*Id.* ¶¶ 107–09.) Verizon, on the other hand, argues that the Amended Complaint suffers from the same pleading deficiencies as the original Complaint and should therefore be dismissed. (Def. Mem. Supp. Mot. Dismiss at 1.)

### DISCUSSION

### I. *Applicable Law*

#### A. *Rule 12(b)(6)*

On a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir.1993); *In re AES Corp. Sec. Litig.*, 825 F.Supp. 578, 583 (S.D.N.Y.1993) (Conner, J.). On such a motion, the issue is "whether the claimant is entitled to offer evidence to support the claims." *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683. A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Padavan v. United States*, 82 F.3d 23, 26 (2d Cir.1996) (*quoting Hughes*

---

5. *See* discussion *infra* Part III.

*v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)). Generally, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34[1][b] (3d ed.1997); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 (2d Cir.1995). Allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, are insufficient as a matter of law. *See Martin v. New York State Dep't of Mental Hygiene*, 588 F.2d 371, 372 (2d Cir.1978).

In assessing the legal sufficiency of a claim, the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference, *see* FED. R. CIV. P. 10(c); *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir.1996), and documents that are "integral" to plaintiff's claims, even if not explicitly incorporated by reference. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46–48 (2d Cir.1991); *Lee v. State of New York Dep't of Corr. Servs.*, No. 97 Civ. 7112, 1999 WL 673339, at *2 n. 4 (S.D.N.Y. Aug. 30, 1999); *see United States Fidelity & Guaranty Co. v. Petroleo*

*Brasileiro S.A.-Petrobras*, No. 98 Civ. 3099, 2001 WL 300735, at *2 (S.D.N.Y. Mar. 27, 2001) ("the Court can consider documents referenced in the complaint and documents that are in the plaintiffs' possession or that the plaintiffs knew of and relied on in their suit."). Pursuant to FED. R. EVID. 201(b), we may take judicial notice of pleadings in other lawsuits attached to the defendant's motion to dismiss, as a matter of public record, *see Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000); *see, e.g., 5–Star Mgmt., Inc. v. Rogers*, 940 F.Supp. 512, 518 (E.D.N.Y.1996), as well as reports filed pursuant to Securities and Exchange Commission ("SEC") regulations as facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir.1991) (limiting holding to forms required to be filed by the SEC and not press releases and announcements).

### B. *The PSLRA and Rule 9(b) Pleading Requirements*

To state a prima facie case under § 10(b) [6] and Rule 10b–5,[7] "a plaintiff must show that 'in connection with the purchase

---

**6.** Section 10(b) of the Securities Exchange Act of 1934 states, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

**7.** Rule 10b–5 states, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

or sale of securities, the defendant, acting with *scienter*, made a false material misrepresentation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.'" *Suez Equity Investors, L.P. v. The Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001) (quoting *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 534 (2d Cir.1999) (alterations in original)).

In 1995, the Securities and Exchange Act was amended by the Private Securities Litigation Reform Act ("PSLRA"), in order "to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries." *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000). In order to effectuate its goal, it places "stringent procedural requirements" on plaintiffs who pursue private securities fraud claims. *Id.* Therefore, with respect to scienter, the PSLRA mandates that in any private action wherein monetary damages are sought, "only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind.*" 15 U.S.C. § 78u–4(b)(2) (emphasis added).[8] With respect to material misrepresentations and omissions, the PSLRA requires that,

[i]n any private action arising under this chapter in which the plaintiff alleges that the defendant -

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed.

*Id.* § 78u–4(b)(1).

Securities fraud actions are also subject to the pleading requirements of FED. R. CIV. P. 9(b) which requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To satisfy this requirement, "a complaint 'must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (quoting *Acito v. IMC-ERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir. 1995)).

## II. *Scienter*

■ Verizon first argues that despite plaintiffs' new allegations involving Verizon's secret motive to terminate, plaintiffs once again fail to adequately plead the requisite element of scienter. In order to satisfy the pleading requirements of 9(b) and the PSLRA, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito,* 47 F.3d at 52 (emphasis added). Although 9(b) requires that allegations of fraud be pleaded with particularity, it also provides that "[m]alice, intent, knowledge, and other

---

**8.** In *Novak,* the court held that the PSLRA adopted the Second Circuit's "strong inference" standard. 216 F.3d at 311. Therefore, pre-PSLRA cases from this Circuit may "provid[e] guidance as to how the 'strong inference' standard may be met.'" *Id.*

conditions of mind of a person may be averred generally." As the Second Circuit explained, "despite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when the facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990). However, this exception to the particularity requirement does not permit plaintiffs to plead scienter based on speculation and conclusory allegations lacking a factual foundation. Rather, plaintiffs "must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Id.* Plaintiffs may satisfy the strong inference requirement by alleging facts either that "show that defendants had both motive and opportunity to commit fraud" or that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Elliott Associates, L.P. v. Hayes*, 141 F.Supp.2d 344, 353 (S.D.N.Y.2000) (citing *Rothman*, 220 F.3d at 88).

### A. *Motive and Opportunity*

■ In defining motive and opportunity, the Second Circuit explained, "[m]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994).

Verizon contends that plaintiffs have inadequately pled motive because they have not shown how misleading NorthPoint's noteholders could lead to the realization of any concrete benefit for Verizon.[9] Plaintiffs respond that the allegations contained in the Amended Complaint clearly imply a motive by Verizon to mislead NorthPoint and its investors, through reassurances of its commitment to the Merger Agreement, in order to gain access to NorthPoint's proprietary business information, encourage NorthPoint to forego other financing opportunities, and compel NorthPoint to expend its resources on expansion so that it would be bankrupted by Verizon's withdrawal from the merger and thus allow Verizon to purchase the company cheaply in bankruptcy.

Even assuming Verizon could realize a concrete benefit by misleading NorthPoint and its investors, the allegations in the Amended Complaint do not support plaintiffs' theory of motive. The only particularized facts plaintiffs allege with respect to their claim that Verizon harbored a secret intent not to follow through with the Merger Agreement are two internal memoranda, sent by Verizon executive Smith to other members of Verizon senior management, apparently proposing an alternative business plan.[10] However, the existence of these memoranda alone does not lead to a strong inference that Verizon possessed the motive that plaintiffs suggest. As a threshold matter, rather than showing a position commonly held within the company, these memoranda on their face are

---

**9.** Verizon cites *Faulkner I* in which the Court noted, with respect to allegations in the *NorthPoint* California Complaint that plaintiffs now advance in support of their theory of scienter, "[e]ven if we took judicial notice of the *NorthPoint* California Complaint ... we fail to see how Verizon could advance that supposed nefarious scheme by giving false encouragement to NorthPoint's investors." 156 F.Supp.2d at 394 n. 5.

**10.** We also note Verizon's objection that plaintiffs have no independent basis for alleging the existence of these memoranda, but merely repeat unverified allegations made in the *NorthPoint* California complaint. (Def. Reply Mem. Supp. Mot. Dismiss at 5 n. 3.)

merely inquiries presented by one member of Verizon management with respect to business strategy. Plaintiffs plead no other facts to suggest that Smith's opinion was shared, or even seriously considered, by other Verizon executives. Plaintiffs' attempt to infer a grand scheme on the part of Verizon from such scant evidence is merely wishful and speculative. Plaintiffs may not satisfy the stringent pleading requirements of the PSLRA by pointing to an isolated inquiry from a single executive and insinuating therefrom an improbable and highly improper motive for the entire corporation. *See, e.g., Elliott,* 141 F.Supp.2d at 360 ("Absent more specific factual allegations, plaintiffs' allegations of motive are merely speculative assertions that fail to satisfy the heightened pleading requirements for scienter."); *Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 643 (N.D.Tex.1999) (dismissing 10b–5 complaint where "alleged motive to commit fraud is not plausible as pleaded").

Moreover, plaintiffs' theory is contradicted by the other particularized facts concerning Verizon's actions with respect to the Merger Agreement. Most importantly, on September 6, 2000, Verizon provided NorthPoint with $150 million in funding.[11] Plaintiffs' unsubstantiated and conclusory allegation that this considerable payment was made in order to gain access to NorthPoint's proprietary information is belied by logic.[12] *See Kalnit v. Eichler,* 264 F.3d 131, 140–41 (2d Cir.2001)

("Where plaintiffs view of the facts defies economic reason, ... it does not yield a reasonable inference of fraudulent intent") (citations omitted). This inference is also directly contradictory to plaintiffs' claim that Verizon's false reassurances of the merger's prospects were intended to compel NorthPoint to expend its resources and drive it into bankruptcy. Instead, Verizon's partial performance of its obligations under the Merger Agreement, which required the expenditure of a significant amount of capital, lends strong support to the position that Verizon initially intended to perform under the contract. *See Elliott,* 141 F.Supp.2d at 355–56 (stating that defendant's partial performance was "compelling evidence that [defendant] intended to perform initially, thus negating any inference of fraudulent intent."); *KNK Medical–Dental Specialities, Ltd. v. Tamex Corp.,* No. 99 Civ. 3409, 2000 WL 1470665, at *4 (E.D.Pa. Sept. 28, 2000) (defendant's "partial performance is evidence that at the time [it] entered into the contract, it intended to perform.") All of the specific actions that plaintiffs allege were taken by Verizon after signing the Merger Agreement were consistent with furtherance of the merger transaction. Furthermore, the sinister goal that plaintiffs ascribe to Verizon, namely forcing NorthPoint into bankruptcy and purchasing its assets cheaply, never materialized. Even though Verizon was granted the right of first refusal for the sale of NorthPoint, it chose not to exercise this option. Although plaintiffs

11. Verizon also points out that the Amended Complaint alleges that Verizon and North-Point made multiple regulatory filings with state and federal agencies in connection with the merger. (Def. Mem. Supp. Mot. Dismiss at 10; Am. Complt. ¶¶ 65–66.)

12. In addition to arguing that Verizon's alleged scheme was rational, plaintiffs cite authority for the proposition that "the possibility—or even the probability—that a scheme

will fail does not warrant dismissal." (Pls. Mem. Opp. Mot. Dismiss at 31.) However, the flaw with plaintiffs' motive theory is not that it involves a potentially unsuccessful scheme, but that the alleged scheme does not make economic sense. It defies logic to believe that Verizon sought to bring about NorthPoint's bankruptcy by giving it $150 million in cash.

cite cases for the proposition that liability for fraud does not depend on receipt of the intended benefit (Pls. Mem. Opp. Mot. Dismiss at 30), the fact that Verizon did not attempt to achieve the object of its alleged motive when given the opportunity further detracts from the sufficiency of plaintiffs' allegations. We therefore hold that plaintiffs have failed to allege a credible theory with respect to Verizon's motive to defraud.

### B. Conscious Misconduct or Recklessness

■ Plaintiffs allege that the Amended Complaint states a claim of recklessness in that Verizon failed to disclose facts known to be contrary to their public statements. (Pls. Mem. Opp. Mot. Dismiss at 34.) In order to plead conscious misconduct or recklessness, "plaintiffs must allege that defendants' conduct was 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Elliott, 141 F.Supp.2d at 357 (quoting In re Carter–Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir.2000)). A claim of recklessness may be stated by "specifically alleg[ing] defendants' knowledge of the facts or access to information contradicting their public statements." Novak, 216 F.3d at 308.

For the same reasons that their allegations of motive are insufficient, plaintiffs have failed to adequately plead a claim of recklessness. Other than mere speculation, plaintiffs have alleged no facts showing that Verizon did not believe the accuracy of its public statements with respect to the merger. The existence of internal memoranda from one executive questioning the company's business strategy is simply insufficient to support the inference that Verizon seriously considered an alternate business plan.[13] Furthermore, "[w]here a plaintiff relies on allegations of recklessness—as opposed to motive and opportunity—to plead fraudulent intent, 'the strength of the circumstantial allegations must be correspondingly greater.'" Elliott, 141 F.Supp.2d at 357 (quoting In re WRT Energy Securities Litig., No. 96 Civ. 3610, 1999 WL 178749, at *8 (S.D.N.Y. March 31, 1999)). Plaintiffs' allegations with respect to Verizon's scienter are thus insufficient to survive dismissal of the Amended Complaint.

### III. Material Misrepresentations or Omissions

■ One of the grounds for dismissal of the original Complaint in Faulkner I was that "all of Verizon's challenged statements ... are merely expressions of optimism concerning an uncertain future event" and therefore not actionable. 156 F.Supp.2d at 397–98. As we explained, "mere opinions and predictions of future performance are not actionable under the securities laws unless 'they are worded as guarantees or are supported by specific statements of fact, or if the speaker does

---

**13.** For this reason, plaintiffs' reliance on cases such as Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726 (2d Cir.1987), is unpersuasive. In that case, the court held that a question of fact existed as to whether defendants' failure to disclose an alternative plan violated the securities laws. Kronfeld, however, involved evidence of an undisclosed plan that, although not formally approved by the Board, was under active consideration by the company. In the instant action, however, there are no specific facts tending to show that Verizon ever considered Smith's inquiry. Furthermore, the court in Kronfeld specifically noted that summary judgment may have been appropriate if plaintiff's case were based solely on evidence of one executive's view. Id. at 733.

not genuinely or reasonably believe them.'" *Id.* at 398 (quoting *In re International Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir.1998)); *see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). In arguing for dismissal of the Amended Complaint, Verizon contends that plaintiffs again depend on statements of optimism concerning a future event that are not actionable. Indeed, in the Amended Complaint, plaintiffs do not allege any additional public statements made by Verizon.

Plaintiffs do not present an argument why Verizon's statements of optimism should be actionable. Instead, they contend that Verizon's reliance on this Court's opinion in *Faulkner I* and similar cases is misplaced because the Amended Complaint "does *not* claim that Verizon's predictive statements were untrue when made." [14] (Pls. Mem. Opp. Mot. Dismiss at 21 n. 5 (emphasis in original).) Plaintiffs thus appear to argue that Verizon's statements were rendered material as a result of a duty to disclose the alleged consideration of an alternative business plan once the prior statements became "materially misleading." (*Id.* at 20.) To bolster their argument, plaintiffs cite cases identifying a duty to disclose in order to correct a prior misleading statement. *See Castellano v. Young & Rubicam*, 257 F.3d 171, 185 (2d Cir.2001); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 ("[A] duty to disclose arises whenever secret informa-

tion renders prior public statements materially misleading."); *Kronfeld*, 832 F.2d at 735–36. However, plaintiffs' argument circumvents the fundamental defect identified by *Faulkner I*: namely, that Verizon's statements are "mere predictions or statements of opinion." 156 F.Supp.2d at 400. None of the cases that plaintiffs cite involve statements of mere optimism about uncertain future contingencies such as the statements involved here. Furthermore, plaintiff has not pled sufficient facts from which to infer that Verizon ever seriously considered an alternative business plan. [15] Therefore, plaintiffs attempt to evade the central issue recognized in *Faulkner I* is unavailing.

In *Faulkner I*, we explained that statements of opinion or optimism could be rendered material misrepresentations if the speaker did not believe their veracity. 156 F.Supp.2d at 398–99. As explained above, *see infra* Part II.B., although the Amended Complaint asserts that Verizon harbored a secret intent to ultimately terminate the Merger Agreement while publicly touting its completion, plaintiffs' pleadings fail to adequately allege the existence of this scheme. We therefore hold that the Amended Complaint again fails to identify any actionable conduct by Verizon. [16]

## CONCLUSION

Plaintiffs' loss on their investment in NorthPoint's commercial paper was sub-

---

**14.** This argument appears to contradict plaintiffs' central assertion in the Amended Complaint that Verizon at no point intended to follow through with its obligations under the merger.

**15.** Even if one member of Verizon management questioned the advisability of the merger, Verizon would be under no obligation to disclose this information. As the court in *Time Warner* explained, a corporation may come under the obligation to disclose alterna-

tive business plans only "when those approaches *are under active and serious consideration.*" *In re Time Warner*, 9 F.3d at 268 (emphasis added).

**16.** Because we hold that the statements of optimism with respect to the merger are not actionable, it is unnecessary to decide whether similar statements made by NorthPoint should be attributed to Verizon.

stantial and regrettable. But they have alleged no proper legal basis for shifting that loss to Verizon. Plaintiffs knew that NorthPoint was losing money in increasing amounts and that their investment involved substantial risk, which is why they got a yield between 13% and 14% per annum. They were betting on the survival and success of the company. They lost. Verizon was betting the same way and was the biggest loser of all.

For the foregoing reasons, Verizon's motion to dismiss is granted. Because plaintiffs have not requested leave to amend, and because this Court has already allowed plaintiffs an opportunity to replead, the Amended Complaint is dismissed with prejudice.

SO ORDERED.