MEMORANDUM OPINION AND ORDER
 

 PRESKA, District Judge.
 

 I. BACKGROUND
 

 A. Procedural History
 

 On April 11, 2003, plaintiffs Teachers’ Retirement System of Louisiana (“Louisi
 
 *DXCVI
 
 ana Teachers”), Louisiana State Employees’ Retirement System (“LASERS”), General Retirement System of the City of Detroit (“Detroit General”) and Fresno County Employees Retirement Association (“FCERA”) (collectively, “Plaintiffs”) filed a Consolidated Class Action Complaint (“Complaint” or “Compl.”) alleging that defendants Bristol Myers Squibb Company (“BMS” or the “Company”) and several of its officers, Peter R. Dolan (“Dolan”), Harrison M. Bains (“Bains”), Charles C. Heim-bold, Jr. (“Heimbold”), Richard J. Lane (“Lane”), Frederick S. Schiff (“Schiff’), Michael F. Mee (“Mee”), Peter S. Ring-rose (“Ringrose”) and Curtis L. Tomlin (“Tomlin”) (collectively with BMS, the “Defendants”, and collectively without BMS, the “Individual Defendants”) violated Section 10(b) of the Securities Exchange Act of 1934 (“Exchange Act”) and Rule 10b-5 promulgated thereunder and that Messrs. Dolan, Heimbold, Lane, Mee and Schiff violated § 20(a) of the Exchange Act by making false and misleading statements regarding the Company’s accounting practices, (the “Accounting allegations”) (see,
 
 e.g.,
 
 Compl. ¶¶ 55, 58-145), and the Company’s investment in ImClone Systems (“ImClone”) (the “ImClone allegations”), (see,
 
 e.g.,
 
 Compl. ¶¶ 57, 146-194), between October 19, 1999 and March 10, 2003 (the “Class Period”).
 

 On May 30, 2003, Defendants BMS, Do-lan, Ringrose and Bains provided Plaintiffs with a description of purported legal deficiencies in the Complaint. Plaintiffs were given the opportunity to amend a final time or to stand on the Complaint as written, with the understanding that no further amendments would be permitted. On June 19, 2003, Plaintiffs informed the Court that they did not intend to amend the Complaint. Thereafter, Defendants filed motions to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.
 

 B. Facts
 

 The following facts are taken from allegations in the Complaint and the documents upon which it is based, which, except where noted, are accepted as true for purposes of the motion to dismiss.
 

 On September 19, 2001, BMS announced a $2 billion equity investment in ImClone pursuant to which the Company agreed to co-market and develop with ImClone the cancer treatment drug Erbitux. (Comply 157.) At the time the investment was announced, ImClone had received “fast-track” approval of the Erbitux Bio-logies License Application (“BLA”) by the Federal Drug Administration (“FDA”). (Comply 150.) This fast track approval meant that the FDA would facilitate the development and expedite the review of the Erbitux BLA. (Compl. 11150.) However, on December 28, 2001, the FDA informed ImClone, by way of a “refusal-to-file” (“RTF”) letter, that the FDA would not review the Erbitux BLA because the data submitted by ImClone was insufficient to support fast track approval at that time. (Compl.HU 181,187-88.)
 

 In April, 2002, BMS issued its Form 10-K for the year ending December 31, 2001, in which it disclosed that certain of its domestic wholesalers had built up excess inventory of the Company’s pharmaceutical products. (Compl.UK 113, 123.) Later the same month, BMS also made an adjustment to its Medicaid and Prime Vendor accrual accounts of $262 million. (Compl.li 123.) Also during April, the SEC began an informal inquiry into the Company’s wholesaler inventory buildup, which later became a formal investigation. (Compl.HH 127, 130.) In October, 2002, the United States Attorney for the District of New Jersey announced an investigation into the same issues. (Compl.HH 132.)
 
 *DXCVII
 
 The Company also initiated and publically disclosed a-plan to workdown excess inventories held by wholesalers. (Declaration of Elizabeth Grayer, executed August 1, 2003 (“Grayer Decl”) Ex. A, at 2.) Throughout the spring and summer, BMS stated that its accounting for pharmaceutical sales to wholesalers during the inventory buildup was appropriate. (Compl.lffl 127, 130, 134.) In late October, 2002, the Company announced that, based on the recent advice of its accountants, PricewaterhouseCoop-ers (“PwC”), the Company expected to restate its financial statements for certain prior periods, primarily to adjust the timing of the Company’s recognition of certain incentivized pharmaceutical sales to wholesalers. (Compl. ¶ 134; Grayer Decl. Ex. A, at 48.)
 

 On December 12, 2002, the
 
 Wall Street Journal
 
 published an article in which BMS’ accounting practices were discussed. (Comply 135.) On March 10, 2003, BMS publicly announced the expected scope and substance of its restatement, which was formally contained in three amended public filings submitted to the SEC on March 19, 2003: a Form 10-K/A for the year ended December 31, 2001 and Forms 10-Q/A for the three-month periods ended March 31, 2002 and June 30, 2002 (collectively, the “Restatement”). (Comply 2.)
 

 II. DISCUSSION
 

 A. Legal Standards
 

 1. Rule 12(b)(6)
 

 For the purposes of a motion to dismiss under Rule 12(b)(6), all well-pleaded factual allegations of the complaint are accepted as true, and all inferences are drawn in favor of the pleader.
 
 See City of Los Angeles v. Preferred Communications, Inc.,
 
 476 U.S. 488, 493, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986);
 
 Miree v. DeKalb County,
 
 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (referring to “well-pleaded allegations”);
 
 Mills v. Polar Molecular Corp.,
 
 12 F.3d 1170, 1174 (2d Cir.1993). “ ‘The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.’ ”
 
 International Audiotext Network, Inc. v. American Tel. & Tel. Co.,
 
 62 F.3d 69, 72 (2d Cir.1995) (quoting
 
 Cortec Indus., Inc. v. Sum Holding, L.P.,
 
 949 F.2d 42, 47 (2d Cir.1991)). The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.
 
 See, e.g., In re Livent, Inc. Noteholders Sec. Litig.,
 
 151 F.Supp.2d 371, 405-06 (S.D.N.Y.2001).
 

 In order to avoid dismissal, plaintiffs must do more than plead mere “conclusory allegations or legal conclusions masquerading as factual conclusions.”
 
 Gebhardt v. Allspect, Inc.,
 
 96 F.Supp.2d 331, 333 (S.D.N.Y.2000) (quoting 2 James Wm. Moore, Moore’s Federal Practice ¶ 12.34[a][b] (3d ed.1997)). Dismissal is proper only when “it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.”
 
 Conley v. Gibson,
 
 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957);
 
 accord Cohen v. Koenig,
 
 25 F.3d 1168, 1172 (2d Cir.1994).
 

 2. Section 10(b) and Rule 10b-5
 

 Section 10(b) of the Exchange Act provides that:
 

 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or of any facility of any national securities exchange — (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or con
 
 *DXCVIII
 
 trivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 

 15 U.S.C. § 78j(b).
 

 In order to state a misrepresentation claim under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must plead that defendants, “ ‘in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs reliance on the defendants’] action caused injury to the plaintiff.’ ”
 
 Lawrence v. Cohn,
 
 325 F.3d 141, 147 (2d Cir.2003) (quoting
 
 Canino v. Citizens Utils. Co.,
 
 228 F.3d 154, 161 (2d Cir.2000));
 
 see also Grandon v. Merrill Lynch & Co.,
 
 147 F.3d 184, 189 (2d Cir.1998).
 

 3. Rule 9(b)
 

 Rule 9(b) requires that “in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.” Fed. R.Civ.P. 9(b). A complaint alleging violations of Section 10(b) and Rule 10b-5 must satisfy the particularity requirement set forth in Rule 9(b). See
 
 Stevelman v. Alias Research, Inc.,
 
 174 F.3d 79, 84 (2d Cir.1999) (citing
 
 Decker v. Massey-Ferguson, Ltd.,
 
 681 F.2d 111, 114 (2d Cir.1982)). The complaint must “ ‘(1) specify the statements that plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.’ ”
 
 Novak v. Kasaks,
 
 216 F.3d 300, 306 (quoting
 
 Shields v. Citytrust Bancorp, Inc.,
 
 25 F.3d 1124, 1128 (2d Cir.1994) (quoting
 
 Mills v. Polar Molecular Corp.,
 
 12 F.3d 1170, 1175 (2d Cir.1993))).
 

 Rule 9(b) also provides that “malice, intent, knowledge, and other condition of mind may be averred generally.” Fed. R.Civ.P. 9(b). The Court of Appeals in
 
 Shields
 
 noted that:
 

 Since Rule 9(b) is intended “to provide a defendant with fair notice of a plaintiffs claim, to safeguard a defendant’s reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit ..., the relaxation of Rule 9(b)’s specificity requirement for scienter ‘must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.’ ”
 

 Shields,
 
 25 F.3d at 1128 (internal citations omitted). Therefore, to give meaning to the overall purpose of Rule 9(b), a fraud plaintiff must “allege facts that give rise to a strong inference of fraudulent intent.” The Private Securities Litigation Reform Act of 1995 (“PSLRA”) also adopts this heightened pleading standard for scienter in securities fraud actions.
 
 See
 
 15 U.S.C. § 78u-4(b)(l) (setting out the requirements for pleading securities fraud actions, including the requirement that a complaint “state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind”).
 
 Chill v. Gen. Elec. Co.,
 
 101 F.3d 263, 267 (2d Cir.1996) (quoting
 
 Acito v. IMCERA Group, Inc.,
 
 47 F.3d 47, 52 (2d Cir.1995)).
 

 Read together, Rule 9(b) and the PSLRA mandate that “plaintiffs must allege the first two elements of a securities fraud claim — fraudulent acts and scien-ter — with particularity”.
 
 Elliott Assocs. L.P. v. Hayes,
 
 141 F.Supp.2d 344, 353 (S.D.N.Y.2000) (citation omitted). Plaintiffs can establish the requisite “strong inference of fraudulent intent” either (a) by demonstrating “that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.”
 
 Kal
 
 
 *DXCIX
 

 nit v. Eichler,
 
 264 F.3d 131, 138-39 (2d Cir.2001).
 

 B. The ImClone Allegations
 

 1. Statements Regarding the ImClone Investment
 

 Plaintiffs have compiled a laundry list of statements made by the Defendants between September 19, 2001 and December 28, 2001, which Plaintiffs contend are false or misleading. These statements were made in conference calls, meetings, interviews, press releases, the Company’s Annual Reports to Shareholders and the Company’s financial statements and pertained to, not surprisingly, matters such as management’s expectations, the Company’s financial outlook, management’s business projections, and the Company’s investment in ImClone. Plaintiffs have identified the speaker of the statements, as well as the time frames and venues in which they were made. Accordingly, Plaintiffs have satisfied the “time, place, speaker, and ... content of the alleged misrepresentation” requirements.
 
 Shields,
 
 25 F.3d at 1129 (quoting
 
 Ouaknine v. MacFarlane,
 
 897 F.2d 75, 79 (2d Cir.1990)).
 

 However, these allegedly fraudulent statements are in all relevant respects identical to those that the Court of Appeals has repeatedly held to be nonactiona-ble expressions of corporate optimism. It is well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true, or constitute puffery or ordinary expressions of corporate optimism.
 
 See In re Int’l Bus. Machs. Corp. Sec. Litig.,
 
 163 F.3d 102, 108 (2d Cir.1998) (opinions regarding future dividends);
 
 Lasker v. N.Y. State Elec. & Gas Corp.,
 
 85 F.3d 55, 58-59 (2d Cir.1996) (predictions about earnings and diversification plans);
 
 San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,
 
 75 F.3d 801, 811 (2d Cir.1996) (holding nonactionable statements about earnings and expected product performance);
 
 Faulkner v. Verizon Communications, Inc., (Faulkner I),
 
 156 F.Supp.2d 384, 388-89, 397-99 (S.D.N.Y.2001) (holding nonactionable defendant’s statements about merger prospects). Likewise, statements of opinion are insufficient to form the basis of a misrepresentation or omission complaint under § 10(b).
 
 See San Leandro,
 
 75 F.3d at 811. Further, statements regarding future performance are actionable only if “they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them.”
 
 IBM Corp. Sec. Litig.,
 
 163 F.3d at 107 (citation omitted);
 
 Faulkner v. Verizon Communications, Inc., (“Faulkner II”),
 
 189 F.Supp.2d 161, 172-73 (S.D.N.Y.2002).
 

 Typical of the statements challenged by Plaintiffs is Lane’s statement on a conference call with Wall Street analysts following the announcement of the Company’s investment in ImClone Systems that “we
 
 think
 
 that this is a tremendous strategic opportunity. We
 
 think
 
 [Erbitux] is real blockbuster
 
 potential,
 
 has the
 
 potential
 
 to be one of the most exciting, if not the most exciting, oncology compound introduced
 
 over the next several
 
 years ... [a]nd it’s a compound with an 18-year patent life, ready to go to market
 
 hopefully
 
 next year,” (CompU 160) (emphasis added), or Schiffs statement on the same call that “as to the highlights — [Erbitux] is a late-stage product with
 
 potential
 
 to drive the growth of our oncology franchise in the near and medium term and extending into 2018. It is a first-in-class novel blockbuster drug for treating cancer,” (Comply 161) (emphasis added).
 

 
 *DC
 
 With respect to the FDA approval of Erbitux, Plaintiffs assert the conclusion that defendant Lane “all but guaranteed” FDA approval but attempt to support that conclusion with the factual allegation that Lane said that he was “very positive about the approval prospects for this drug” and that he did not
 
 “think
 
 [FDA rejection of the Erbitux BLA is]
 
 very probable.
 
 The fact is, I don’t
 
 think
 
 it’s
 
 likely
 
 at all that this drug won’t get approved.”
 
 [1]
 
 (Compl. ¶ 163 (emphasis added).) Plaintiffs’ selective quotations from the referenced conference call distort Lane’s statement — no such “guarantee” was made, and thus I reject the allegation that Lane “all but guaranteed” FDA approval.
 
 See Livent,
 
 151 F.Supp.2d at 405-06. On that call, Richard Bellson, an analyst with Capital Research Company, asked what consequences would follow from a request by the FDA for Phase III study data prior to approving the Erbitux BLA.
 
 (See
 
 Grayer Decl. Ex. F, at 8.) Lane responded:
 

 Well, first off, we don’t
 
 think
 
 it’s very
 
 probably
 
 [sic], fact is I don’t think it’s
 
 likely
 
 at all, that this drug won’t get approved. We have the milestone pay-merits as Fred cited, and if additional studies were required we would work with ImClone to do those studies. It will remain to
 
 see [sic] what the FDA asks
 
 but I’ve [sic] very positive about the approval
 
 prospects
 
 for this drug.
 

 (Id.
 
 (emphasis added).)
 

 Taken in context, Lane’s statement regarding FDA approval cannot be considered a guarantee of FDA approval or otherwise false or misleading. It predicts the action the Company would take in the event the Erbitux BLA was not approved and it expresses personal optimism about regulatory events not under the Company’s control. Any reasonable investor reading these statements, or any of the other statements regarding Erbitux complained of by Plaintiffs (Compl.¶¶ 158-166), would recognize that the Defendants could not and did not guarantee that Erbitux would be approved by the FDA, either in the near term or at all.
 
 [2]
 

 See Faulkner I,
 
 156 F.Supp.2d at 398. Statements such as these are plainly opinions, not guarantees, and are not actionable.
 
 See, e.g., IBM Corp. Sec. Litig.,
 
 163 F.3d at 108.
 
 [3]
 

 
 *DCI
 
 Also typical of the statements which Plaintiffs complain of are the statements allegedly made by defendants Do-lan, Lane, Schiff and Ringrose on the day BMS’ investment in Erbitux was announced. For example, in a press release, Dolan is alleged to have stated:
 

 ... ImClone Systems’ [Erbitux] represents one of the most important advances in cancer medicine since the introduction of Taxol ... The partnership with ImClone Systems demonstrates our continued commitment to achieve our strategies for growth; focuses our efforts on medicines with blockbuster potential; broadens our growth opportunities through aggressive external development; and is a significant step toward becoming a leader in biologies.
 

 (CompLV 158.)
 

 On the same day, defendant Schiff is alleged to have given his opinion regarding the ImClone investment and Erbitux in a conference call: “It is a first-in-class novel blockbuster drug for treating cancer.” (Comply 161.)
 

 Defendant Ringrose, also on the conference call, is alleged to have said: “It
 
 potentially
 
 represents one of the most important advances in cancer medicine,” (Compl. ¶ 162 (emphasis added)), and “[n]eedless to say, the discussions between ImClone and the FDA have been ongoing for some months now. So we would be
 
 surprised,
 
 based on those ongoing discussions, if the FDA took a different position on [the trial],” (Compl. ¶ 164 (emphasis added)).
 

 Based on the cases cited above, I find that the statements regarding ImClone and Erbitux that Plaintiffs complain of constitute non-actionable opinion, personal or corporate optimism and puffery.
 

 2. Statements By ImClone
 

 To state a claim under § 10(b) and Rule 10b-5, Plaintiffs must allege that Defendants made a material false or misleading statement or omission.
 
 Wright v. Ernst & Young LLP,
 
 152 F.3d 169, 174-75 (2d Cir.1998). In
 
 Central Bank,
 
 the Supreme Court established unequivocally that a § 10(b) claim is not actionable unless the
 
 defendant
 
 is accused of making the false or misleading statements at issue.
 
 Central Bank of Denver. N.A. v. First Interstate Bank of Denver, N.A.,
 
 511 U.S. 164, 177-78, 180, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (emphasis added).
 
 [4]
 
 Following the Court’s decision in
 
 Central Bank,
 
 the Court of Appeals held that “[allegations of ‘assisting,’ ‘participating in,’ ‘complicity in,’ and similar synonyms ... all fall within the prohibitive bar of
 
 Central Bank.
 
 A claim under § 10(b) must allege a defendant has made a material misstatement or omission .... ”
 
 Shapiro v. Cantor,
 
 123 F.3d 717, 720-21 (2d Cir.1997);
 
 Wright,
 
 152 F.3d at 175 (“[A] secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination.”). Therefore, to the extent Plaintiffs complain about allegedly false statements made by ImClone (Compl.¶¶ 183, 192), that complaint is addressed to the wrong defendant.
 

 Similarly, to the extent Plaintiffs claim that Defendants had a duty to correct, update, or speak about any of the alleged misstatements by ImClone, (Comply 183-192), they are also directing
 
 *DCII
 
 that claim to the wrong defendants. A duty to correct arises when a party makes a material statement it believes to be true but subsequent events prove otherwise.
 
 See IBM Corp. Sec. Litig.,
 
 163 F.3d at 109. A party has no duty to correct statements not attributable to it.
 
 Elkind v. Liggett & Myers, Inc.,
 
 635 F.2d 156, 162-63 (2d Cir.1980);
 
 SEC v. Wellshire Sec., Inc.,
 
 773 F.Supp. 569, 573 (S.D.N.Y.1991).
 

 3. Scienter
 

 As noted above, the PSLRA echoes this Circuit’s pleading standard for scienter, requiring that Plaintiffs “state with particularity facts giving rise to a strong inference that Defendants acted with the required state of mind.” 15 U.S.C. § 78u-4(b)(1). Plaintiffs can establish the requisite “strong inference of fraudulent intent” either (a) by demonstrating “that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.”
 
 Kalnit,
 
 264 F.3d at 138-39.
 

 In attempting to fulfill the scienter requirement, Plaintiffs recite a number of statements relating to Erbitux made by the Defendants (all of which I have already determined are opinion, personal or corporate optimism or corporate puffery), point to the RFT letter from the FDA and then announce the conclusion that the Defendants knew all along that the FDA was not going to approve the Erbitux BLA in the near term or at all.
 
 [5]
 
 Even if the statements Plaintiffs complain of were actionable under § 10(b) and Rule 10b-5, Plaintiffs have failed adequately to allege that Defendants acted with fraudulent intent.
 

 a. Motive and Opportunity
 

 In an attempt to create the appearance of motive, Plaintiffs rely on allegations of ordinary corporate desire and on a mischaracterization of the Individual Defendants’ stock sales during the alleged Class Period, when in fact the sales reveal a total absence of inappropriate trading by the Individual Defendants.
 
 (See, e.g.,
 
 Compl. ¶¶ 238 — 48.) To imply opportunity, Plaintiffs rely (as a matter of law, inadequately) on the Individual Defendants’ positions of control and authority. (Compl.f 364.) However, such conclusory allegations of opportunity do not suffice.
 
 See Chill,
 
 101 F.3d at 267-68.
 

 The Court of Appeals has held that although maintaining the appearance of corporate profitability, or of the success of an investment, will involve benefit to a corporation, allegations that defendants were motivated by those desires in connection with making allegedly false statements are not sufficient to support an inference of scienter.
 
 See, e.g., Chill,
 
 101 F.3d at 267-68. In so holding, the Court ruled that every publicly-held corporation desires its stock to be priced highly by the market and to hold that allegations to that effect were sufficient motive would be to render the motive requirement meaningless.
 
 Id.
 
 at 268 n. 5.
 

 Plaintiffs’ motive allegations here amount to nothing more than a pejorative characterization of these ordinary corporate desires. Plaintiffs claim that Defendants made a deal with ImClone to “make it appear that the future of the Company was more promising,” (ComplA 8), or to “maintain a facade of future potential” for the Company’s drug pipeline, (Comply 146). In the same vein, Plaintiffs allege that Defendants were interested in Erbitux to address potential concerns about patent expirations the Company faced on certain of its products.
 
 *DCIII
 
 (Compl.1ffl 52-55.) These “motives” are nothing more than ordinary and prudent corporate desires.
 
 See Chill,
 
 101 F.3d at 268 n. 5. Plaintiffs allege no “concrete benefits” that would accrue to the Defendants as a result of the misstatements alleged, beyond those enjoyed by any corporate executive. Such general allegations are insufficient to establish motive under § 10(b).
 
 See id.; Shields,
 
 25 F.3d at 1130.
 

 Plaintiffs also point to Defendants’ transactions in the Company’s stock during the Class Period as evidence of motive. While “unusual” executive stock trading under some circumstances may give rise to an inference of fraudulent intent,
 
 see In re Northern Telecom Ltd. Sec. Litig.,
 
 116 F.Supp.2d 446, 462-63 (S.D.N.Y.2000) (citing
 
 Acito,
 
 47 F.3d at 54), executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent.
 
 In re Northern Telecom,
 
 116 F.Supp.2d at 462-63;
 
 In re Hudson Techs. Inc. Sec. Litig.,
 
 No. 98 Civ. 1616, 1999 WL 767418, at *9 (S.D.N.Y. Sept. 28, 1999).
 

 Here, Plaintiffs’ conclusory allegations that “Defendants’ Insider Trading Supports a Strong Inference of Scienter,” (Compl. p. 87, ¶ G; ¶¶ 238-247), are insufficient to carry them burden of pleading that the Individual Defendants’ transactions were “unusual.” Indeed, the documents reflecting the Individual Defendants’ trading in BMS stock during the Class Period
 
 [6]
 
 show a consistent pattern of trading undertaken primarily to make payments required for the exercise of stock options or to pay taxes.
 
 See Ressler
 
 v.
 
 Liz Claiborne Inc.,
 
 75 F.Supp.2d 43, 59-60 (S.D.N.Y.1999) (sales to meet tax obligations not indicative of fraud). In fact, the documents upon which the Complaint is based suggest, and, at oral argument, Plaintiffs’ counsel acknowledged, (Tr. 103), that the Individual Defendants, in almost every instance,
 
 increased
 
 their BMS holdings during the Class Period — a fact wholly inconsistent with fraudulent intent.
 
 [7]
 

 See In re Keyspan Corp. Sec. Litig.,
 
 No. 01 CV 5852, 2003 WL 1702279, at *20 (E.D.N.Y. Mar.21, 2003).
 

 Plaintiffs also attempt to allege motive by alleging that the Individual Defendants had compensation plans tied to the Company’s performance.
 
 (See, e.g.,
 
 Compl. ¶¶ 228-37.) Such plans are typical of nearly every corporation. Beginning in the 1990s, stock options became a common feature in employees’ compensation packages.
 
 See
 
 National Commission on Entrepreneurship,
 
 Employee Stock Options: Their Use and Policy Implications
 
 (June 2000),
 
 available at
 
 http://www.ncoe.org/re-search/index.html. Thus, the Court of Appeals rejected performance-based compensation as evidence of motive sufficient to support a strong inference of scienter, noting that if performance-based compensation were a sufficient predicate for fraud, then “virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions”.
 
 Acito,
 
 47 F.3d at 54;
 
 see also In re Keyspan Corp. Sec. Litig.,
 
 2003 WL 1702279 at *20-21. Here, Plaintiffs have pleaded no facts that would remove the BMS compensation plan from this general rule.
 

 Similarly, Plaintiffs allege that the Individual Defendants had “motive” because their salaries were “based on factors such as the impact of the individual’s performance on the business results of the
 
 *DCIV
 
 Company.” (Comply 229(a).) However, to allege motive successfully, plaintiffs must “do more than merely charge that executives aim to prolong the benefits of the positions they hold.”
 
 Shields,
 
 25 F.3d at 1130. Again, Plaintiffs have pleaded no facts that would remove the Individual Defendants’ compensation packages from this general rule. Accordingly, Plaintiffs have failed adequately to allege motive and opportunity.
 

 b. Conscious Misbehavior or Recklessness
 

 When motive is not established, the “strength of the circumstantial allegations must be correspondingly greater.”
 
 Kalnit,
 
 264 F.3d at 142. To meet this strong circumstantial evidence standard, Plaintiffs must “specifically alleg[e] defendants’ knowledge of the facts or access to information contradicting their public statements.”
 
 Faulkner II,
 
 189 F.Supp.2d at 172. The allegations offered by Plaintiffs fall short of this requirement.
 

 First, Plaintiffs claim the Individual Defendants knew their public statements regarding Erbitux were false and misleading because of information in the Company’s possession concerning “flaws” (ComplA 157) in the Erbitux trial and an absence of data regarding the treatment’s effectiveness as a “single agent,”
 
 (see
 
 Compl. ¶¶ 152, 155, 167). Plaintiffs point to a memorandum allegedly written by unidentified “Company executives,” (ComplA 151), and two emails, (Compile 152, 155), which state that Im-Clone had not, at the time those communications were written, submitted “single agent” data on Erbitux, (ComplA 151) and an email from an independent radiologist regarding the response rates and the sam-pie size of the Erbitux trial, (Comply 153). Even if the Individual Defendants had this information to the effect that ImClone’s data might not have met the standards ImClone set,
 
 (see
 
 Tr. 27-29), such knowledge is insufficient to lead to an inference that the speakers knew that the general and optimistic statements about Erbitux’s clinical and commercial possibilities of which Plaintiffs complain were untrue. To the contrary, and particularly with regard to the Wall Street analyst call cited by Plaintiffs, Defendants openly discussed actions the Company would take in the event the Erbitux BLA was not approved.
 
 (See
 
 Grayer Decl. Ex. F, at 6, 8-9.) Thus, Plaintiffs have failed to meet their burden.
 
 See Faulkner II,
 
 189 F.Supp.2d at 172;
 
 see also Robbins v. Moore Med. Corp.,
 
 894 F.Supp. 661, 672 (S.D.N.Y.1995) (rejecting similar evidence).
 

 Second, Plaintiffs point to Brian Marki-son’s testimony before Congress that BMS had an “inkling” that the FDA might not approve Erbitux prior to the Company’s consummation of the ImClone partnership as evidence that Defendants knew their public statements were false and misleading. (Comphf 177.) Far from supporting Plaintiffs’ allegation that Defendants knowingly misrepresented the regulatory, medical and commercial prospects of Erbi-tux, Markison’s characterization suggests just the opposite. Given the uncertainty inherent in any application for FDA approval, Defendants’ alleged “inkling,” which is a “hint,” “suggestion” or “slight indication,”
 
 [8]
 
 is reasonable and entirely consistent with Defendants’ public statements about Erbitux. It certainly does not constitute strong circumstantial evidence of conscious misbehavior or recklessness.
 

 
 *DCV
 
 Third, Plaintiffs quote from newspaper and magazine articles which state that Defendants were “on the [telephone] line” during a discussion between ImClone and the FDA or “should have been aware of any problems” with Erbitux. (Compl.lffl 179, 189.) These conclusory allegations and opinions “taken from a newspaper reporter’s notebook” cannot satisfy the strictures of Rule 9(b) or the PSLRA and cannot be a predicate for fraud under § 10(b) and Rule 10b-5.
 
 Ferber,
 
 785 F.Supp. at 1108;
 
 see Acito
 
 47 F.3d at 51-52;
 
 Hershfang,
 
 767 F.Supp. at 1255. Accordingly, Plaintiffs have failed adequately to plead scienter as to the ImClone allegations.
 

 C. The Accounting Allegations
 

 1. Channel Stuffing
 

 Although in classic fraud-by-hindsight pleading style, Plaintiffs slap the title “claim” on virtually every item disclosed in the Restatement,
 
 (see
 
 Compl. ¶ 56), their accounting claims relate primarily to what has been characterized as “channel-stuffing.”
 
 [9]
 
 As alleged in the Complaint and disclosed in the documents on which the Complaint is based, prior to the events at issue, BMS recognized revenue from product sales upon shipment to customers.
 
 (See, e.g.,
 
 Grayer Decl. Ex. B(l) at 36, Ex. B(2) at 34, Ex. B(3) at 30 (BMS Forms 10-K).) During the Class Period, “sales incentives were offered to wholesalers generally towards the end of the quarter in order to ineentivize [sic] wholesalers to purchase products in an amount sufficient to meet [BMS’] quarterly sales projections established by [BMS’] senior management.” (Comply 45.) After certain statements, generally in the 2001-2002 time period, to the effect that BMS “monitors [wholesalers’ inventory levels] fairly closely,”
 
 (e.g.,
 
 Compl. ¶ 207), and the Company’s April 2002 disclosure in its 2001 Form 10-K that certain of its domestic wholesalers had built up excess inventories of the Company’s pharmaceuticals primarily due to the incentives (Compl.1ffl 113, 123), BMS announced in or about October of 2002, that it would restate its financial statements for earlier periods (ComplA 134.) On or about March 18, 2003, BMS restated its financials for the Class Period. (Compl. ¶ 140; Grayer Decl. Ex. A.) In so doing, it stated:
 

 A significant portion of the Company’s sales is made to wholesalers. The Company experienced a substantial buildup of wholesaler inventories in its U.S. pharmaceuticals business over several years, primarily in 2000 and 2001. This buildup was primarily due to sales incentives offered by the Company to its wholesalers, including discounts, buy-ins in anticipation of price increases, and extended payment terms to certain U.S. pharmaceuticals wholesalers. These incentives were generally offered towards the end of a quarter in order to incen-tivize wholesalers to purchase products in an amount sufficient to meet the Company’s quarterly sales projections established by the Company’s senior management. The time of the Company’s recognition of revenue from its sales to wholesalers differs by wholesaler and by period.
 

 Historically, the Company recognized revenue for sales upon shipment of product to its customers. Under GAAP, revenue is recognized when substantially all the risks and rewards of ownership have transferred. In the case of sales made to wholesalers, (1) as a result of incentives, (2) in excess of the wholesal
 
 *DCVI
 
 er’s ordinary course of business inventory level, (3) at a time when there was an understanding, agreement, course of dealing or consistent business practice that the Company would extend incentives based on levels of excess inventory in connection with future purchases (4) at a time when such incentives would cover substantially all, and vary directly with, the wholesaler’s cost of carrying inventory in excess of the wholesaler’s ordinary course of business inventory level, substantially all the risks and rewards of ownership do not transfer upon shipment and, accordingly, such sales should be accounted for using the consignment model. The determination of when, if at all, sales to a wholesaler meet the foregoing criteria involves evaluation of a variety of factors and a number of complex judgments.
 

 Under the consignment model, the Company dos not recognize revenue upon shipment of product. Rather, upon shipment of product the Company invoices the wholesaler, records deferred revenue at gross invoice sales price and classifies the inventory held by the wholesalers as consignment inventory at the Company’s cost of such inventory. The Company recognizes revenue (net of discounts, rebates, estimated sales allowances and accruals for returns) when the consignment inventory is no longer subject to incentive arrangements but not later than when such inventory is sold through to the wholesalers’ customers, on a first-in first-out (FIFO) basis. For additional discussion of the Company’s revenue recognition policy, see Note 1, Accounting Policies, to the restated consolidated financial statements.
 

 The Company has restated its previously issued financial statements to correct the time of revenue recognition for certain previously recognized U.S. pharmaceuticals sales to Cardinal Health, Inc. (Cardinal) and McKesson Corporation (McKesson), tow of the largest wholesalers for the Company’s U.S. pharmaceuticals business, that, based on the application of the criteria described above, were recorded in error at the time of shipment and should have been accounted for using the consignment model. The Company has determined that shipments of product to Cardinal and shipments of product to McKesson met the consignment model criteria set forth above as of July 1, 1999 and July 1, 2000, respectively, and, in each case, continuing through the end of 2001 and for some period thereafter. Accordingly, the consignment model as required to be applied to such shipments. Prior to those respective periods, the Company recognized revenue with respect to sales to Cardinal and McKesson upon shipment of product. Although the Company generally views approximately one month of supply as a desirable level of wholesaler inventory on a going-forward basis and as a level of wholesaler inventory representative of an industry average, in applying the consignment model to sales to Cardinal and McKes-son, the Company defined inventory in excess of the wholesaler’s ordinary course of business inventory level as inventory above two weeks and three weeks supply, respectively, based on the levels of inventory that Cardinal and McKesson required to be used as the basis for negotiation of incentives granted ....
 

 (Grayer Deck Ex A at 20-21.)
 

 The parties agree that the fact of the Restatement establishes that the prior fi-nancials were incorrect at the time and that the error was material. (Tr. at 50-51, 54, 59.) They disagree as to whether scienter has been adequately pleaded. I find that it has not.
 

 
 *DCVII
 
 a. Motive and Opportunity
 

 The discussion in B.3.a.,
 
 supra,
 
 is, of course, applicable to the Accounting Allegations as well. For the reasons stated there, Plaintiffs have failed adequately to plead motive.
 

 b. Conscious Misbehavior or Recklessness
 

 As noted above, when motive is not established, the “strength of the circumstantial allegations must be correspondingly greater.”
 
 Kalnit,
 
 264 F.3d at 142. Plaintiffs must “specifically alleg[e] defendants’ knowledge of the facts or access to information contradicting their public statements.”
 
 Faulkner II,
 
 189 F.Supp.2d at 172.
 

 As is fairly apparent in the lengthy Complaint and in Plaintiffs’ brief,- but was made crystal clear at oral argument, it is Plaintiffs’ view that because Defendants supposedly knew the “facts” upon which the Restatement was based, (Tr. at 53, 68-69), that is, the four factors applied in the Restatement, they knew or should have known that revenue should not have been recognized upon shipment of the goods at issue and, thus, they consciously misbehaved or were reckless in recognizing income on sales that were made to wholesalers (1) as a result of incentives, (2) in excess of the wholesaler’s ordinary course of business inventory level, (3) at a time when there was an understanding, agreement, course of dealing or consistent business practice that the Company would extend incentives based on levels of excess inventory in connection with future purchases, (4) at a time when such incentives would cover substantially all, and vary directly with, the wholesaler’s cost of carrying inventory in excess of the wholesaler’s ordinary course of business inventory level.
 
 (See
 
 Restatement, Grayer Decl. Ex. A, at 20-21.)
 

 There are several things wrong with this picture. First, contrary to Plaintiffs’ counsel’s statements at arguments,
 
 [10]
 
 a Restatement of financial results or “[all-legations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.”
 
 Chill,
 
 101 F.3d at 270-71;
 
 see also In re Segue Software, Inc. Sec. Litig.,
 
 106 F.Supp.2d 161, 169-70 (D.Mass.2000) (“[A] Restatement of earnings, without more, does not support a strong inference of fraud, or for that matter, a weak one.”). Thus, the Restatement alone does not provide a basis for inferring scienter.
 

 Second, Plaintiffs muddy the waters significantly by asserting throughout the Complaint that the sales at issue “were nothing more than consignment sales.”
 
 (See e.g.,
 
 Compl. ¶¶ 1, 5, 6, 63, 64, 114, 195, 202, 210, 222). As Plaintiffs point out in their brief:
 

 ... a consignment is an arrangement whereby products are ‘shipped to a dealer who pays only for what he sells and who may return what is unsold.’ Webster’s Ninth New Collegiate Dictionary at 280;
 
 see also Malone v. Microdyne Corp.,
 
 26 F.3d 471, 476 n. 6 (4th Cir.1994) (“a consignment is a transaction in which goods are delivered by a consign- or to a dealer or distributor (the consignee) primarily for sale by the consignee, and the consignee has the right
 
 *DCVIII
 
 to return any unsold commercial units of the goods in lieu of payment”).
 

 Opp. at 23.
 
 [11]
 
 The record discloses, and Plaintiffs’ counsel confirmed at oral argument, (Tr. at 38-39), however, that the sales at issue were not within the traditional (and undisputed) definition of consignment sales because there was no right of return.
 
 (See, e.g.,
 
 Grayer Reply Decl.
 
 [12]
 
 Exs. R and S, Cardinal’s
 
 [13]
 
 and McKes-son’s SEC filings.)
 
 [14]
 
 Thus, Plaintiffs’ legal characterization of the sales at issue as consignment sales is rejected because it is inconsistent with the documents upon which the Complaint is based.
 
 (See In re Livent,
 
 151 F.Supp.2d at 405-06 (“a court need not feel constrained to accept as truth conflicting pleadings... that are contradicted either by statements in the Complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice”)) (citations omitted).
 

 Third, Plaintiffs argue that conscious misbehavior or recklessness may be inferred because, they say, there is no proper business reason for offering incentives to wholesalers to buy more product than they currently need in order to meet earnings estimates.
 
 (See, e.g.,
 
 Tr. at 46.) Indeed, at oral argument, Plaintiffs’ counsel was quite explicit that “these shipments did not qualify as sales under GAAP because of the incentives.” (Tr. at 67;
 
 see also
 
 Tr. at 68.) To the contrary, offering incentives to meet goals, aggressive or not, is not suspect when, as BMS’ counsel notes, “real products [were] shipped to real customers who then paid with real money.” (BMS Br. at 24.)
 
 [15]
 
 Offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegation that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness.
 

 The real question here is whether at the time of the sales at issue the Defendants knew or should have known that the revenue from those sales should have been treated differently and, thus, that the contemporaneous financials were incorrect.
 
 See Faulkner II,
 
 189 F.Supp.2d at 172. Plaintiffs argue that “[t]he fact that the fraud involved violations of the most fundamental principles of GAAP supports a strong inference of scienter,” (Opp. at 21) and that “the GAAP provisions at issue are simple[,] and their violation obvious”
 
 (see, e.g.,
 
 Opp. at 22). Again Plaintiffs’ characterizations are belied by the documents upon which the Complaint is based.
 

 As noted above, Plaintiffs’ counsel conceded the sales at issue were not traditional consignment sales because there was no
 
 *DCIX
 
 right of return. (Tr. at 38-39.) Thus, cases cited by Plaintiffs based on violations of “simple” or “fundamental” principals of GAAP like
 
 Malone v. Microdyne Corp.,
 
 26 F.3d 471, 478 (4th Cir.1994) (“We cannot find a single precedent ... holding that a company may violate FAS 48 and substantially overstate its revenues by reporting consignment transactions as sales without running afoul of Rule 10b — 5”) are inappo-site. Also inapposite is, for example,
 
 In re Scholastic Corp. Sec. Litig.,
 
 252 F.3d 63 (2d Cir.2001), where the company represented that return rates for its books remained at normal levels of 20% at the same time that it knew that the return rate for January of 1997 had increased 150% over the prior year.
 

 While in this case the applicable accounting principle might be simple,
 
 i.e.,
 
 whether all the risks and rewards of ownership transferred upon shipment of the goods, the application of that principle to the facts is complex. In contrast to the cases where known (or knowable) facts like return rates were misrepresented or where true consignment sales were not disclosed or accounted for as such pursuant to well-known, easily applied accounting rules, there is no allegation here that the accounting treatment adopted by BMS in the Restatement was the subject of prior accounting rules or literature. Rather, the accounting treatment adopted as proper in the Restatement required evaluation of four factors, including as number four, whether at the time of the incentive sales under consideration, “such incentives would cover substantially all, and vary directly with, the wholesaler’s cost of carrying inventory in excess of the wholesaler’s ordinary course of business inventory level.” (Grayer Decl. Ex. A, at 20).
 
 [16]
 
 As set out in the Restatement after recitation of the four factors adopted as the proper treatment for the sales at issue: “[t]he determination of when, if at all, sales to a wholesaler meet the foregoing criteria involves evaluation of a variety of factors and a number of complex judgments.” (Restatement, Grayer Decl. Ex. A, at 20.)
 

 Indeed, the complexity of the consignment model is demonstrated not only on its face but by its application, as set out in the Restatement. There, shipments of product to Cardinal and McKesson, BMS’ two largest distributors, were deemed to meet the criteria adopted in the consignment model for differing periods — as of July 1, 1999 for Cardinal and as of July 1, 2000 for McKesson — and then only for some sales.
 
 (Id.)
 
 Also as set out in the Restatement, although BMS viewed one month supply as “a level of wholesales inventory representative of an industry average,” it used two and three weeks of supply for Cardinal and McKesson, respectively, in applying the consignment model because those wholesalers had used those periods as the basis for negotiation of incentives.
 
 (Id.
 
 at 20-21.)
 

 At oral argument, counsel went back and forth on violation of basic accounting principles,
 
 (e.g.,
 
 when the risks and rewards of ownership are transferred (Tr. at 65)), and the complex four-part test devised by the Company and PwC and applied in the Restatement to determine whether the risks and rewards of ownership had been transferred in the sales in question, (Tr. at 33-34). While there is no requirement that a defendant must know the precise accounting treatment that would have been applied before he can
 
 *DCX
 
 have the requisite scienter, it is agreed,
 
 (see
 
 Tr. at 47, 58), that the complaint must “specifically alleg[e] defendants’ knowledge of the facts or access to information contradicting their public statements.”
 
 Faulkner II,
 
 189 F.Supp.2d at 172. Here, that means Plaintiffs must allege facts from which a strong inference can be drawn that Defendants knew or were reckless in not knowing that the accounting for the sales at issue was wrong and, therefore, that the financials recognizing revenue on those sales were wrong.
 

 On these facts, where it is alleged that (i) management set aggressive targets, (ii) incentives were given to wholesalers to buy product before they actually needed it, (iii) in order to meet earnings estimates, (iv) it was known that wholesaler inventories were higher than usual, and (v) real products were shipped to real customers who paid real money, there is no strong inference that Defendants knew or should have known that the sales should have been accounted for in some way other than the Company’s historical revenue recognition upon shipment model, and, therefore, conscious misbehavior or recklessness cannot be inferred.
 
 See Kalnit,
 
 264 F.3d at 142-43 (discussing
 
 Novak,
 
 216 F.3d at 304, and
 
 Rothman v. Gregor,
 
 220 F.3d 81, 90-91 (2d Cir.2000), each of which the Court characterized as involving a corporation’s “publicly known accounting policies.” The Court found “that the
 
 Novak
 
 or
 
 Rothman
 
 defendants were reckless (or consciously misbehaving) in not disclosing their inventory losses was more clear” than in
 
 Kalnit
 
 where the obligation to disclose a potential superior merger proposal was not so clear and thus held that the failure to disclose in
 
 Kalnit
 
 did not give rise to a finding of scienter). Accordingly, Plaintiffs have failed to plead conscious misbehavior or recklessness as to the channel stuffing allegations.
 

 2. Other Accounting Allegations
 

 The remaining items disclosed in the Restatement, and thus complained about by Plaintiffs, fare no better.
 

 a. Oncology Therapeutics Network (“OTN”)
 

 Plaintiffs complain that BMS participated in certain aspects of post-sale distribution of its OTN products pursuant to a contract with McKesson but did not account for these sales as consignments even though they were “entirely devoid of any indicia of a sale.” (Compl.1ffl 67-68, 202.) As part of the Restatement, BMS indeed determined that it should recognize revenues from OTN sales on a consignment model (Restatement at 20-21, Grayer Decl. Ex. A.) Nowhere, however, do Plaintiffs allege any facts or access to facts by any Defendant to the effect that at the time of the OTN sales to McKesson that those sales should have been accounted for on a consignment basis. Accordingly, the claim fails.
 

 b. Acquisition, Divestiture and Restructuring Reserve
 

 Plaintiffs complain of what they label as “Cookie Jar Reserves” and, somewhat less colorfully, “Inappropriate Divestiture Reserves, Inappropriate Restructuring Reserves” and “Inappropriate Acquisition Reserves.” (CompLIffl 73-96.) As part of its Restatement of certain reserves, BMS disclosed that “based on its investigation of accounting practices in certain areas that involve significant judgments,” the Company determined that portions of certain acquisition, divestiture and restructuring reserves were established inappropriately and, with respect to acquisitions and divestitures, reversed inappropriately.
 
 (See
 
 Restatement at 53 (acquisitions), 54 (divestitures), 55-56 (re
 
 *DCXI
 
 structuring), Grayer Decl. Ex. A.) Again, in textbook pleading-by-hindsight style, Plaintiffs then assert the conclusion that “the inappropriate reserves also demonstrates [sic] the defendants’ scienter.” (Compl. ¶202;
 
 see also id.
 
 ¶200.) Such conclusory allegations are insufficient. Plaintiffs must allege facts demonstrating that Defendants knew or should have known that the reserves were inappropriate at the time they were established (or reversed).
 
 See Shields, 25
 
 F.3d at 1128-29;
 
 Faulkner II,
 
 189 F.Supp.2d at 172. Plaintiffs make no such allegations. Rather, plaintiffs quote extensively from various accounting literature
 
 (see, e.g.,
 
 Compl. ¶¶ 79, 83-85, 93), then allege, less than helpfully, that the reserves established by the Company were “intentional” (CompU 91), or a “slush fund” (Comply 80). Plaintiffs make no specific factual allegations of Defendants’ actual knowledge or access to knowledge that the reserves in question were inappropriate at the time they were established or reversed. As previously noted, allegations of GAAP violations, standing alone, do not establish scienter.
 
 Chill,
 
 101 F.3d at 270-71. Nor do conclusory allegations about cookie jars and slush funds.
 
 See Acito,
 
 47 F.3d at 53;
 
 Shields,
 
 25 F.3d at 1128-29. Accordingly, the claim based on BMS’ accounting for its reserves fails.
 

 c. Other Undisclosed Transactions
 

 Plaintiffs allege various other material omissions from the Company’s SEC filings during the Class Period, (Compl.lffl 104-109), including items which BMS initially believed were immaterial (Comply 104). As noted above, the initial omission and subsequent Restatement of these items, is insufficient standing alone to show that Defendants intended to defraud. Rather, Plaintiffs must plead facts showing that the Defendants knew or were reckless in not knowing that the omissions were material at the time the filings were made but Plaintiffs have not done so. Instead, they simply point, once again, to the Restatement, which indicates, at most, that Defendants should have disclosed certain transactions.
 
 Carter-Wallace Sec. Litig., 220
 
 F.3d at 39-40;
 
 Chill,
 
 101 F.3d at 269-70;
 
 Hudson Techs., Inc. Sec. Litig.,
 
 1999 WL 767418, at *5 (S.D.N.Y.1999). A mistake, however, does not constitute fraud.
 
 See id.
 
 Rather, the Complaint must specifically allege reckless conduct which is, at least, “highly unreasonable and which represents an extreme departure from the standards of ordinary care.”
 
 Id.
 
 Plaintiffs’ references to SAB 99 and the Company’s Restatement (Compl.1ffl 105-07) fall far short of meeting this burden. Plaintiffs’ allegations therefore fail to meet the particularity requirements of Rule 9(b) and the PSLRA.
 

 For the same reason, Plaintiffs may not bootstrap the Company’s correction of “certain known errors made in the application of GAAP that were previously not recorded because in each such case the Company believed that the amount of any such error was not material to the Company’s consolidated financial statement,” (Comply 199), into conscious misbehavior or recklessness. The conclusion pleaded that “defendants knew or recklessly disregarded ‘the materiality of the errors is insufficient.’ ”
 

 d. Undisclosed Gains
 

 Plaintiffs also attempt to show conscious misbehavior or recklessness by claiming that BMS “failed to disclose” the existence of “unusual gains” in the case of six asset sales. (Complin 104, 111.) Based on the documents on which the Complaint is based, however, the allegation is demonstrably false, and thus I reject it.
 
 See Livent,
 
 151 F.Supp.2d at 405-05. Defendants disclosed the sales of each of these
 
 *DCXII
 
 assets in the “Divestitures” note to the Company’s Forms 10-Q for the relevant periods.
 
 (See
 
 Grayer Decl. Ex. C.) Plaintiffs further allege that the Company’s practice of including the gains on these asset sales in the “Marketing, Selling, Administrative and Other” (“MSA & 0”) line of the Company’s quarterly SEC filings was deliberately deceptive. To the contrary, this method of reporting asset sales was a common practice approved by the Company’s independent auditors and, more importantly, each sale was explicitly and contemporaneously disclosed, making the Company’s reporting for these items transparent. Moreover, the gains on sales were separately identified as part of reported Operating Results in the relevant Forms 10-K.
 
 (Id.)
 
 In this context, Schiffs statement that “there [were] no unusual items [in the First Quarter 2001 MSA & 0 line]” (Compl. ¶ 112) is not evidence of fraud, as Plaintiffs allege, but is entirely accurate. Accordingly, this claim must fail.
 

 Finally, to the extent that Plaintiffs complain of other supposed misrepresentations or omissions in BMS accounting during the Class Period,
 
 (see, e.g.,
 
 Compl. ¶ 56), the allegations follow the pattern set out above: Plaintiffs identify an item included in the Restatement assert, that its contemporaneous accounting violated the most basic accounting rules and then conclude from the Restatement that there is strong circumstantial evidence that Defendants knew or “recklessly disregarded the overwhelming prevalence of improper accounting practices .and falsification of the Company’s financial results throughout the Class Period.”
 
 (See, e.g.
 
 Compl. ¶ 201.) Such
 
 ipse dixits
 
 are insufficient to meet the requirements of Rule 9(b) and the PSLRA. Accordingly, all of the accounting claims are dismissed.
 

 Because the Complaint is dismissed in its entirety, I need not address § 20(a) liability or the Individual Defendants’ separate motions.
 

 CONCLUSION
 

 For the reasons set out above, Defendants’ motions (Docket Nos. 56, 58, 61, 63, 65, 67) to dismiss are granted, and the Complaint is dismissed with prejudice.
 

 The Clerk of the Court shall mark this action closed and all pending motions denied as moot.
 

 SO ORDERED
 

 [1]
 

 . When questioned at oral argument about whether any of the Defendants ever made a statement such as "we are going to get FDA approval”, counsel for Plaintiffs responded that they had not, and that, if they had, nobody would believe them. (Rough transcript of March 29, 2004 oral argument graciously supplied by the court reporter (“Tr.”) at 10.) Plaintiffs' assertion that had the Defendants expressly guaranteed FDA approval of Erbi-tux in the near future "nobody” would have believed them seems to fly in the face of Plaintiffs’ allegation that the Defendants’ statements amounted to a guarantee that the FDA would approve Erbitux in the near future, upon which Plaintiffs relied to their detriment.
 

 [2]
 

 . It is not entirely clear whether Plaintiffs assert that Defendants knew that "Erbitux would not gain approval in the foreseeable future,”
 
 (see, e.g.,
 
 Compl. ¶ 8), or that Defendants knew that "there was virtually no chance of Erbitux receiving FDA approval” at any time,
 
 (see, e.g.,
 
 Compl. ¶ 167). Whatever the precise allegation is, the statements complained of are still non actionable opinion or corporate puffery.
 

 [3]
 

 .In addition, Plaintiffs also refer to a
 
 "Wall Street Journal
 
 article in which Plaintiffs say BMS was quoted "as stating that it expects Erbitux to be approved for sale as early as next year.” (ComplA 173.) This is another instance of a statement of opinion. Further, such an unattributed statement from a newspaper article does not establish a link between the Defendants and the alleged fraud sufficient to satisfy Rule 9(b)’s particularity requirement.
 
 See Hershfang v. Citicorp, 161
 
 F.Supp. 1251, 1256 (S.D.N.Y.1991) ("It goes without saying that the defendant is entitled, under Rule 9(b), to know who made these allegedly fraudulent remarks, when they were made, and where they were made.”) (citation omitted).
 

 [4]
 

 . The Court reasoned that: (1) a claim of fraud based on statements made by a third party would amount to aiding and abetting, which the statute did not prohibit, and (2) that a claim alleging fraud based on statements made by a third party could not survive a motion to dismiss because it failed to allege reliance on any misstatement by the named defendant, as required.
 
 Central Bank,
 
 511 U.S. at 168-69, 177-78, 180, 114 S.Ct. 1439.
 

 [5]
 

 .
 
 See supra
 
 note 2.
 

 [6]
 

 .
 
 See
 
 Forms 4 and 5 filed by the Individual Defendants recording changes in beneficial ownership of the securities held. (Grayer Decl. Exs. G-N.)
 

 [7]
 

 . In light of these now uncontested facts, it appears that it is Plaintiffs' allegations of insider trading that were reckless.
 

 [8]
 

 . Webster's New Universal Unabridged Dictionary 944 (2d ed.1979). (Grayer Decl. Ex. P.)
 

 [9]
 

 . "Channel-stuffing refers to a practice whereby a company intentionally ships more of its products to distributors than what they require by retail demand.” (Comply 59.)
 

 [10]
 

 . "The Court: But you’ve forgotten to tell me how the Company knew at the time that the accounting was improper.
 

 Mr. Berger: The fact of a restatement, what a restatement is, is an admission that based upon the facts and circumstances at the time the sales were not proper.”
 

 (Tr. at 46.)
 

 [11]
 

 . Reference is to the Memorandum of Law in Opposition to the Defendants' Motions to Dismiss the Consolidated Class Action Complaint dated September 12, 2003.
 

 [12]
 

 . Reference is to the Declaration of Elizabeth Grayer, executed on October 10, 2003.
 

 [13]
 

 . For example, Cardinal describes an increase in inventories for the first quarter of 2001 as due in part to "investing in inventories in conjunction with various vendor-margin [i.e., sales incentive] programs” with a concomitant increase in accounts payable. (Grayer Reply Decl. Ex. R, at 16.)
 

 [14]
 

 . Indeed, as pointed out at oral argument, (Tr. at 62), there is no allegation that the return policy on the sales at issue was any different from the Company’s historical policy where revenue from sales was recognized upon shipment.
 

 [15]
 

 . Reference is to the Memorandum of Defendants Bristol-Myers Squibb Company, et al. in Support of their Motion to Dismiss the Consolidated Class Action Complaint dated August 1, 2003.
 

 [16]
 

 . As is clear on the fact of this factor and as noted at oral argument, in order to apply this four-part test (and, thus, to trigger a different accounting treatment from the Company’s traditional recognition of income from sales upon shipment), one had to know the wholesalers' carrying costs, (Tr. at 57), and the level of inventory deemed "excess”
 
 (see
 
 Tr. at 60).